*[853] SCHWAB, C. J.
The state appeals from an order suppressing inculpatory statements made by the defendant. It contests the findings that (1) the defendant was "in custody” when he initially confessed to the police; (2) the defendant should not have been questioned after he requested an attorney; and (3) the defendant’s incriminating telephone conversation with his family was the "fruit” of his illegally obtained initial confession.
FACTS OF THE CASE
On February 12, 1977, Ricardo Villalodos was murdered at approximately 4 a.m. The defendant’s college dormitory roommate told police that the defendant was near the decedent with a knife at the time of the murder. The roommate also told police that defendant had threatened him with a knife.
The police, officers Heide and Van Horn, waited for defendant to return to his dormitory room. The defendant returned at 8 a.m. He was handcuffed at gunpoint, given Miranda warnings, and taken to the police station. Defendant was seated in the back of the police car next to one officer. At the police station he was questioned and also asked if he wished to take a polygraph test. The defendant asked if he could speak with a lawyer. The police allowed him to contact a lawyer who soon arrived at the police station. The lawyer spoke to the defendant and then told the police that the defendant wanted to go home for the day because he was tired. He also stated that the defendant would return February 13 to take a polygraph test. The lawyer also gave police permission to continue questioning the defendant the following day. The police agreed to this arrangement and allowed defendant to go home.
On February 13,1977, at 9 a.m., Officers Heide and Van Horn arrived at the defendant’s dormitory room in order to transport him to the police station for a *[854] polygraph test. The police pickup of the defendant had been arranged the day before. Before defendant left the dormitory, he was accompanied by both officers to the basement of the dormitory when he went to pick up some clothes that he had been washing there.
Subsequently, defendant was taken to the police car. He was seated in the back seat with one officer. On the way to the police station, defendant indicated he wanted to take a polygraph test, but wanted to talk to his attorney first.
On arrival at the police station, the defendant and the officers entered through a "combination lock”-type of door. The defendant was interviewed in an 8-by-10-foot windowless room with the door closed at all times. The defendant attempted to contact several lawyers whom the lawyer he had obtained the previous day had recommended. None was available. The defendant then called his first lawyer and, after a brief conversation, the defendant indicated to police that he would take the polygraph test on February 14.
The police, at this point, no longer asked defendant if he wanted to take a polygraph test. Instead, they asked the defendant if he were willing to discuss the homicide. Officers Heide and Van Horn pointed out to the defendant the inconsistencies in defendant’s statements to police on February 12. At this point, the defendant volunteered to take the polygraph test immediately. When questioned by the police about his decision, the defendant indicated that he wanted to take the test without a lawyer present.
Defendant, at 10 a.m., was introduced to Officer Mitchell, the polygraph examiner. The defendant signed a consent form before taking the test which indicated that he was a "suspect” in the present case. At 10:05 a.m. the polygraph test began. After the test was completed, the defendant was told by Mitchell that it was obvious that the defendant had not told the truth about his involvement in the case and that *[855] Mitchell knew that the defendant had been in a room where a man was stabbed. The defendant then said, "I better talk to my attorney before I say anything or I answer any questions.” Mitchell then again stated that he thought that defendant had not told the truth.
Mitchell then turned the defendant back over to Heide and Van Horn. The defendant, Heide and Van Horn were standing in a hallway. Mitchell told them that the defendant was "more involved in this incident than he is telling you, but how much he is involved, I do not know.” Mitchell did not mention the defendant’s request to speak to an attorney.
The record is unclear as to what transpired at this point. Heide testified that he asked the defendant if he was willing to talk to the police further and stated that defendant said "yes.” Van Horn testified that defendant was never asked if he wished to go on speaking with the police.
Defendant was then returned to the original interview room and told by Heide and Van Horn that they believed he was involved in the homicide. They also stated that they did not know if he was a witness or a suspect. Heide and Van Horn then asked defendant (1) if he would be willing to tell police just what his involvement in the homicide was; (2) if he had stabbed the decedent; and (3) if he saw who had killed the decedent.
After a pause of 30 seconds, defendant told police he was willing to cooperate, but wished to return the next day, at which time he would explain his involvement in the homicide. The defendant also stated that he wanted to go home to talk to his parents before telling Heide and Van Horn about his involvement in the homicide. Heide and Van Horn responded that they were in the middle of a homicide investigation and that if the defendant had valuable information, he should give it to them immediately.
*[856] The defendant then twice asked Heide and Van Horn if he could speak to his parents if he first told the police what had happened. Heide and Van Horn stated that he could, and also told defendant he was not under arrest. Defendant then asked the police if he would be able to leave if he described the nature of his involvement in the homicide. Heide and Van Horn said "yes.” Defendant paused briefly and, at 11 a.m., told police that he had killed "Ricky.” Heide and Van Horn were surprised at defendant’s confession. They had expected defendant to implicate his roommate, since they had just discovered evidence implicating his roommate.
After defendant confessed, Heide and Van Horn asked him if they could tape his confession. The defendant agreed, but then changed his mind. Defendant was then asked if he knew he did not have to talk to police and if he knew he had the right to have an attorney present. The police then asked defendant why he had confessed and he replied, "[bjecause of the pressure of the investigation and the pressure from within me.”
Defendant was then arrested, advised of his Miranda rights, taken from the interview room and then escorted to another room where he was permitted to call his parents. He spoke to them over the phone in Spanish. An interpreter was called into the room and took notes of the conversation.
I. Was the Defendant "In Custody” When He Initially Confessed to the Police?
In Miranda v. Arizona, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966), the United States Supreme Court held that a specific warning is required when a defendant is subjected to a "custodial interrogation,” defined as
"* * * questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way * * 384 US at 444.
*[857] Most of the case law arising in this area after Miranda centers on the question of whether a defendant was "in custody” at the time the statements in question were made. However, before we consider that problem, it should be noted that a Miranda warning is required only when a defendant is subject to a "custodial interrogation.” In this case, neither the state nor the defendant disputes that he was interrogated by the police during his two days in the police station. Consequently, we need only discuss whether the defendant was "in custody” at the time he was questioned by the police.
A. "In Custody” Defined
As noted above, "custodial interrogation” is defined in Miranda as occurring when a person has been taken into custody "or otherwise deprived of his freedom of action in any significant way.” 384 US at 444. The question of how great a restriction may be placed on an individual’s freedom without invoking the protections of Miranda must be decided on the facts of each case. In order to decide the more difficult cases, courts have attempted to devise tests to determine what constitutes "custody” and what constitutes deprivation "of * * * freedom of action in any significant way.”
When Miranda was decided, courts had become familiar with the "focus test” of Escobedo v. Illinois, 378 US 478, 84 S Ct 1758, 12 L Ed 2d 977 (1964). Escobedo held that certain rights of the accused arise when the "investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect.” 378 US at 490. Some courts, accustomed to this test, began to apply it to cases arising under Miranda. See, e.g., Brown v. Beto, 468 F2d 1284 (5th Cir 1972); Windsor v. United States, 389 F2d 530 (5th Cir 1968). However, the great majority of courts, including Oregon’s, have rejected the focus test. Smith, The Threshold Question In Applying Miranda: What Constitutes Custodial Interrogation?, 25 S C L Rev 699,710 (1974). In State v. Crossen, 10 Or *[858] App 442, 499 P2d 1357, Sup Ct review denied (1972), we stated:
"* * * As we read Miranda and its progeny * * *the term 'focal suspect’ no longer has much, if any, significance, because those opinions tell us that police are not required to give Miranda advice to an individual at the moment they have probable cause to believe he may be guilty of a crime — that the Miranda advice is required only when the interrogation is 'custodial.’ ” 10 Or App at 449. (Footnote omitted.)
Most courts which have rejected the focus test have, in its place, looked to whether the individual’s freedom of action has been significantly restrained. A difficulty arises as to whether this restraint should be measured in an objective or subjective manner. The objective manner would look to how the various circumstances surrounding an interrogation might affect a reasonable person, while the subjective manner would look to whether a particular interrogated defendant believed himself to be in custody. Although the subjective test is supported by some scholars, see, e.g., Rothblatt and Pitler, Police Interrogation: Warnings and Waivers — Where Do We Go From Here, 42 Notre Dame Lawyer 479, 485 (1967), the majority of courts has chosen the objective test. See, e.g., United States v. Hall, 421 F2d 540, 544 (2d Cir 1969), cert denied 397 US 990 (1970); People v. Arnold, 66 Cal2d 438, 444, 58 Cal Rptr 115, 121, 426 P2d 515, 521 (1967).[1] According to this test, "[cjustody occurs if the suspect is deprived of his freedom of action in any significant way or is led to believe, as a reasonable man, that he is so deprived.” People v. Arnold, supra, 66 Cal2d at 444.
*[859] The Oregon Supreme Court in State v. Evans, 241 Or 567, 407 P2d 621 (1965), a pre-Miranda decision, held that a person is in custody if there
"* * * be some element of police control and consequent inhibition on freedom of movement, some circumstance, or some word or action on the part of the police that can be reasonably construed as physical or psychological restraint * * 241 Or at 574. (Emphasis supplied.)
We have applied the objective test in determining when an individual is in custody. In State v. Myers, 6 Or App 219, 487 P2d 663 (1971), the state contended that a suppression order issued by the trial court on the basis of a Miranda violation was improper because the defendants involved were neither in custody nor in a police-dominated atmosphere in which the coercive effects of custody were present. In upholding the trial court finding that the defendants were in custody, we stated, "A fair reading of all the circumstances involved here leads us to the conclusion that defendants were subjected to custodial interrogation * * 6 Or App at 222. (Emphasis supplied.) Myers implicitly utilized an objective test in determining the custody issue, as this language indicates.[2]
*[860] B. Factors to be Considered in the Objective Approach.
In making determinations of whether a defendant was "in custody” for the purposes of Miranda, we have looked to at least three specific circumstances surrounding a defendant’s interrogation.
First, we often examine whether the defendant could have left the scene of the interrogation voluntarily. See State v. Travis, 250 Or 213, 218, 441 P2d 597 (1968) ("[T]he suspect was in fact free of restraint at all times and left the scene of the interrogation as a free man.”); State ex rel Juv. Dept. v. D., 27 Or App 861, 867, 557 P2d 687 (1976), Sup Ct review denied (1977) ("There are no circumstances indicating that [defendant] could not have walked away at will.”); State ex rel Juv. Dept. v. Brown, 19 Or App 427, 432, 528 P2d 569 (1974) , Sup Ct review denied, cert denied 421 US 1003 (1975) ; ("[Defendant testified] * * * that he felt that he was free to go at any time until he was arrested.”); State v. Myers, supra ("We cannot imagine that [defendants] were free to leave prior to the termination of their interrogation.”).
Second, we often focus on whether the defendant was questioned by the police as a suspect or merely as a witness. See State v. Crossen, 10 Or App 442, 449, n 1, 499 P2d 1357, Sup Ct review denied (1972) ("[T]he fact that a person is a suspect may have some evidentiary significance in determining whether the interrogation was custodial by virtue of that individual’s being deprived of his freedom of action * * *.”); State v. Brown, 9 Or App 137, 140, 495 P2d 304, Sup Ct review denied (1972) ("[Defendant was not in custody. Although he was interviewed at the police station, he was interviewed as a witness and not as a suspect.”).
Finally, we look to whether a defendant freely and voluntarily accompanied police to the place of his questioning. See State v. Mathiason, 22 Or App 494, 495, 539 P2d 1122 (1975), rev’d and remanded, 275 Or *[861] 1, 549 P2d 643 (1976), rev’d and remanded sub nom Oregon v. Mathiason, 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977) ("Defendant came voluntarily to the police station at the request of the state trooper [and was not in custody].”); State v. Brown, supra, 9 Or App at 138 ("[Police did not have defendant in custody where they] contacted defendant at the residence of [his] girl friend and defendant agreed to go with them to the state police office * * *.”).
C. Police Station Interrogations.
Courts have applied the above-mentioned factors in determining whether interrogations conducted by police at police stations are indeed custodial. The United States Supreme Court, in Oregon v. Mathiason, 429 US 492, supra, was faced with a situation where the defendant had voluntarily come to a police station. The defendant did so in response to a note left by police at his apartment which indicated the police were interested in discussing "something” with the defendant. After receiving the note, the defendant called a police officer and arranged a meeting. The defendant expressed no preference as to the place of meeting, so the officer suggested his own police station. The officer and defendant later met at the police station and shook hands. The officer and the defendant entered an office. The defendant was told he was not under arrest. The door to the office was closed and the officer then told the defendant that he believed the defendant was involved in a burglary. The defendant sat for a few minutes and then admitted that he had taken the property involved in the burglary. The defendant was then advised of his Miranda rights. The defendant moved to exclude the confession on the ground that it was not preceded by a Miranda warning. The trial court refused to suppress the confession, finding that the defendant was not in custody at the time of the confession.
On appeal, the United States Supreme Court ultimately upheld the order of the trial court, The court *[862] found that the defendant was not questioned in a manner in which his "freedom to depart was restricted in any way.” 429 US at 497. Mathiason emphasized that the defendant came voluntarily to the police station and was informed he was not under arrest. The fact that the questioning took place in a "coercive environment” was not sufficient to place the defendant in custody.
The court pointed out that any interview of one suspected of a crime "will have its coercive aspects to it.” 429 US at 498. However, it stressed that police were not required to administer Miranda warnings to everyone whom they questioned. The fact that an interview with a suspect takes place in a police station, the court noted, does not automatically rise to the level of coercion requiring Miranda warnings to be given to the suspect. The court concluded that such warnings are required only when "there has been such a restriction on a person’s freedom as to render him 'in custody.’ ” 429 US at 495.
D. Application of the Above Factors to this Case.
Mathiason is not dispositive, on its facts, of this case. The court there simply held that police-station interrogations of a defendant were not inherently coercive, thus requiring Miranda warnings. Here, there are many facts beyond a mere interrogation at a police station indicating that the defendant may have been questioned in a coercive environment. A closer examination of all the facts in this case is thus necessary to determine if defendant was in custody.
It should first be noted that defendant was brought to the police station on February 12,1977, handcuffed in the back seat of a police car. Defendant was handcuffed at gunpoint. One police officer sat next to him while another drove the car to the station. The police admitted at the suppression hearing that defendant was objectively "in custody” on February 12. On the morning of February 13, the day as to which the question of defendant’s custody status *[863] arises, defendant was met at his room by the same officers who had placed him in custody the previous day. Before leaving for the police station, defendant picked up his laundry from the basement of his dormitory, accompanied by both officers. He then was brought to the police car where he was seated, once again, in the back seat with one officer by his side.
This police treatment of defendant on February 13 differed in no substantial manner from the treatment accorded him on February 12, except for the fact that no handcuffs or guns were used. Since defendant was in custody on February 12, it is reasonable for him to have assumed that he was also in custody on February 13. No explanation is offered by the state as to why it might be reasonable to assume that defendant’s custody status had changed. The fact that defendant was even followed by police when he went to pick up his laundry buttresses this view, since it is apparent that the police action here was "such a restriction on [his] freedom as to render him in custody.” Oregon v. Mathiason, supra, 429 US at 495. Defendant did not freely and voluntarily accompany the police to the scene of his questioning, at least not in the same manner as the defendants in State v. Mathiason, and State v. Brown, both supra.
Subsequent police treatment of defendant reinforces the conclusion that he was in custody. Defendant was informed that he was a suspect, as opposed to a witness, by the consent form used by Officer Mitchell to administer the polygraph test. This information, as noted in State v. Brown, supra, and State v. Crossen, supra, is one factor to be considered when evaluating the custody status of a defendant. Furthermore, it is reasonable to assume that defendant could not have simply walked out of the police station at any time. When defendant asked the police if he would be able to leave the police station if he told them the nature of his involvement in the homicide, the police simply replied "yes,” but said nothing more. The implication *[864] of this response to a reasonable person might well be that if defendant did not tell of his involvement, then he would not be free to go. Under the rationale of State v. Travis, State ex rel Juv. Dept. v. D., State ex rel Juv. Dept. v. Brown, and State v. Myers, all supra, these facts indicate that defendant was in custody at the police station.
II. Did the Defendant Waive his Miranda Rights?
Our conclusion that defendant was in custody compels us to determine whether defendant effectively waived his rights under Miranda. The relevant portions of Miranda state:
"Once warnings have been given, the subsequent procedure is clear. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to the police, they must respect his decision to remain silent.
* m * *
"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived * * * his right to retained or appointed counsel * * 38.4 US at 473-75.
These rules are applicable to the facts in this case, because it is undisputed that defendant did state to Officer Mitchell in the polygraph room, "I had better talk to my attorney before I say anything or answer any questions.” The core issue involved here is the propriety of the continued police questioning of defendant after he made this statement.
The basic position of the Oregon Courts in the area of waiver was summarized in State v. Dyke, 19 Or App 705, 528 P2d 1073 (1974):
«* * * During questioning at the scene, defendant answered some questions, refused to answer another *[865] question and declined to say anything further. The law does not prohibit him from changing his mind. * * * [T]he police are entitled to ask him if he has changed his mind, but * * * they cannot attempt to persuade him to do so and * * * they may not continue to question him after he claims his rights * * 19 Or App at 710.
A. Attempts to Persuade.
In State v. Suggs, 13 Or App 484, 511 P2d 405 (1973), we found that a defendant’s Miranda rights had been violated where he had requested an attorney at least three times. Instead of providing one, the police continued to try to persuade the defendant to speak with statements such as, " '* * * Unless you have something to hide, some information to keep from us, I can’t see that it would be necessary for you to have an attorney * * *.’ ” 13 Or App at 488. (Emphasis deleted.) The court found that this type of subtle police persuasion was exactly the type of conduct Miranda was designed to prevent. Similarly, in State v. Garrison, 16 Or App 588, 594, 519 P2d 1295, Sup Ct review denied (1974), we found that police statements such as, "Is there anything you want to straighten with us first?,” were improper when made after a defendant had requested the presence of an attorney.
These two decisions indicate that police are not permitted to attempt to persuade a defendant from retracting his request for an attorney. While State v. Dyke, supra, does state that police may simply ask a defendant if he has changed his mind, police use of subtly coercive questioning to achieve a change of mind, as in State v. Suggs, supra, and State v. Garrison, supra, is not permissible under Miranda. See Michigan v. Mosley, 423 US 96, 105, 96 S Ct 321, 46 L Ed 2d 313 (1975).
B. Continued Questioning.
State v. Nicholson, 19 Or App 226, 527 P2d 140, Sup Ct review denied (1974), involved a defendant who stated to police that he wanted a lawyer after he was *[866] read his Miranda rights. The defendant was given a phone in order to call an attorney, but did not do so because he did not know an attorney to call. Subsequently, police continued interrogating the defendant. We found this action to be improper, stating:
"* * * The request for counsel was clear. After a few minutes of indecision the detectives * * * continued the interrogation. * * * The defendant is not required to make repeated requests for counsel; one is sufficient * * *.” 19 Or App at 232.
Similarly, in State v. Ayers, 16 Or App 300, 303, 518 P2d 190, Sup Ct review denied, cert denied 419 US 1093 (1974), we suppressed a defendant’s confession made after he stated, " ' " Maybe I should see an attorney, or I should talk to an attorney.” ’ ” Ayers found: "(Police] questioning, after defendant indicated he wanted an attorney, was improper.” 16 Or App at 303.
This court and the Oregon Supreme Court have sometimes found further questioning of a defendant who had asserted his right to counsel to be proper. However, in each instance that we held admissible statements made by a defendant after he asserted his right to counsel under Miranda, the defendant was (1) subsequently given another Miranda warning after an initial warning and (2) the police questioning which ultimately elicited the incriminating statements occurred at least several horns or days after the initial questioning. See State v. Whitewater, 251 Or 304, 307-08, 445 P2d 594 (1968); State v. Dyke, supra at 707; State v. Freeman, 5 Or App 372, 374-75, 484 P2d 867 (1971).
C. Application of the Above Factors to this Case.
The facts presented in this case indicate that after defendant asserted his right to counsel to Officer Mitchell, he was returned to Officers Heide and Van Horn. Mitchell made no mention of defendant’s assertion of his right to counsel. Exactly what transpired at this point is unclear, as noted in the statement of facts. *[867] It is uncertain whether Heide asked defendant whether he was willing to talk further about the homicide. The state contends that defendant answered "yes” to this question and that such a response constituted an express waiver of his right to counsel. However, no findings of fact on this point were made by the trial court, so it must be presinned that the court made a finding of fact consistent with its conclusion. See Ball v. Gladden, 250 Or 485, 487, 443 P2d 621 (1968). Thus, because the trial court found that the police should have ceased questioning defendant after his request for an attorney at the polygraph test, we presume that defendant was brought back into the interview room, without waiving his right to counsel, and asked: (1) if he would be willing to tell just what his involvement in the incident was; (2) if he had stabbed the decedent Ricky; and (3) if he saw who had killed Ricky.
The Oregon cases discussed above indicate that this was improper police conduct. The first question asked by the police was an attempt to persuade defendant to change his mind about asserting his right to counsel, impermissible under State v. Nicholson, supra, and State v. Ayers, supra. The second and third questions were impermissible under State v. Suggs, and State v. Garrison, both supra, because they amounted to an attempt to persuade the defendant to continue speaking to the police. In addition, the facts here contain none of the extenuating factors present in State v. Whitewater, supra, State v. Dyke, supra or State v. Freeman, supra. Defendant was neither given another Miranda warning before being questioned by Van Horn and Heide nor did any appreciable period of time elapse after defendant’s initial assertion of his right to counsel. We note that Mitchell never told Heide and Van Horn about defendant’s desire to speak with an attorney. To sanction such a procedure would be to encourage police to "pass off’ suspects who have asserted their Miranda rights to other police who have not witnessed such assertions.
*[868] In view of the above, defendant cannot be held to have waived his asserted right to counsel. Here, the police questioning should not have continued when defendant asserted his rights.
TTT Was the Defendant’s Incriminating Telephone Conversation the "Fruit” of His Illegally Obtained Confession?
The "Fruit-of-the-poisonous-tree” doctrine was first enunciated in Silverthorne Lumber Co. v. United States, 251 US 385, 40 S Ct 182, 64 L Ed 319, 24 ALR 1429 (1920), where federal agents illegally seized documents, photographed them, and then returned them to the defendant. The court held that the use of the photographs at trial was improper:
"* * * The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. * * * If knowledge of [the facts] is gained from an independent source they may be proved like any others, but the knowledge gained by the Government’s own wrong cannot be used by it in the way proposed * * 251 US at 392.
In Nardone v. United States, 308 US 338, 60 S Ct 266, 84 L Ed 307 (1939), the court qualified the rule of Silverthome by noting that although there might be a causal connection between the "poisoned tree” and the evidence offered at trial, the "connection may have become so attenuated as to dissipate the taint.” 308 US at 341.
The Supreme Court clarified the application of the "fruit-of-the-poisonous-tree” doctrine in Wong Sun v. United States, 371 US 471, 83 S Ct 407, 97 L Ed 2d 441 (1963). The court set forth a two-part test to determine whether a subsequent discovery of evidence is tainted with the primary illegality: (1) The exclusionary rule has no application where the government learns of the evidence "from an independent source”; and (2) the exclusionary rule has no application when the connection between the lawless conduct of the police and the *[869] discovery of the challenged evidence has become so attenuated as to dissipate the taint. 371 US at 487-88.
The court then indicated that all evidence is not "fruit” simply because it would not have come to light but for the illegal actions of the police. Rather, the controlling question in each case is
"* * * 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or by means sufficiently distinguished to be purged of the primary taint’ * * 371 US at 488, quoting from Maguire, Evidence of Guilt 221 (1959).
Although the Supreme Court has failed to elaborate on what it meant by the "independent source” language of Wong Sun, lower federal courts and state courts have interpreted the language in various ways to develop exceptions to the "fruit-of-the-poisonous-tree” doctrine. Many courts, including this court, have accepted the "inevitable-discovery” exception to the "fruit-of-the-poisonous-tree” doctrine. See Note, The Inevitable Discovery Exception to the Constitutional Exclusionary Rules, 74 Colum L Rev 88, 90 (1974). In State v. Garrison, 21 Or App 155, 534 P2d 210, Sup Ct review denied (1975), we stated that:
"* * * Courts recognizing [the inevitable-discovery exception] hold that fruit of the unlawful evidence is not inadmissible * * * where it is shown that such evidence inevitably would have been gained from an independent source * * *. We join the courts which subscribe to the above limitation.” 21 Or App at 157. (Footnotes and citations omitted.)
*[870] «* * * [AJfter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. * * * In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from *[871] making a usable one after those conditions have been removed * * *.” 331 US at 540-41.
*[869] See also State v. Armstrong, 24 Or App 785, 791, 547 P2d 170, Sup Ct review denied (1976). But see State v. Crossen, 10 Or App 442, 499 P2d 1357 (1972). Thus, the prosecution can succeed in removing the taint when it can establish that the incriminating evidence would have been discovered in the absence of illegal police conduct. The burden of proof of that showing rests on the state. See Alderman v. United States, 394 *[870] US 165, 183, 89 S Ct 961, 22 L Ed 2d 176 (1969). See also ORS 133.683.[3]
A. Consecutive Confessions.
A problem which often arises in confession cases is the effect of an inadmissible confession upon other confessions taken from the accused later during the investigation. The courts have developed certain criteria which they utilize to determine if the second confession is, under the Wong Sun test, purged from the primary taint of the first confession.
A frequently cited decision in this area which reflects the current state of the law is United States v. Bayer, 331 US 532, 67 S Ct 1394, 91 L Ed 1654 (1947). In Bayer, the court dealt with the admissibility of a second confession obtained from a defendant six months after an initial inadmissible confession. The court upheld the admissibility of the second confession, emphasizing that the defendant (1) had made the second confession six months after the first; (2) was not under any sort of restraint on his freedom during that time, and (3) had received fair warning the second confession might be used against him. However, in dictum, the court noted:
*[871] Thus, it is clear that no special presumption applies to the successive confession situation. However, an analysis of judicial treatment of consecutive confession cases reveals that courts usually examine two factors in making determinations about the admissibility of a second confession: (1) the time when the second confession was made; and (2) the place where the second confession was made.
The United States Supreme Court’s analysis of the Bayer facts focuses on these two factors. The court used an identical analysis in Westover v. United States, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966). In Westover, the defendant was interrogated by a local police force which failed to give him warning about his right to silence. Subsequently, he was questioned by FBI agents who gave the defendant a proper warning. The court found that the defendant’s statements to the FBI were not admissible into evidence. Westover stressed that:
«* * * [Ji]ere the FBI interrogation was conducted immediately following the state interrogation in the same police station — in the same compelling surroundings * * 384 US at 496. (Emphasis supplied.)
The Westover court placed great emphasis on the time and place of the defendant’s second confession, much like the Bayer court. See also Leyra v. Denno, 347 US 556, 74 S Ct 716, 98 L Ed 948 (1954).
We have utilized a similar analysis in determining the admissibility of second confessions following an improper first confession. State v. Garrison, 16 Or App 588, 519 P2d 1295, Sup Ct review denied (1976), involved a defendant who confessed after he was not given a proper Miranda warning. Six hours after the original confession, the defendant again confessed after receiving proper Miranda warnings. We found that
*[872] «* * * although the defendant was removed in place from his original interrogation, the time interval was not sufficient to dissipate the taint * * 16 Or App at 601. (Emphasis supplied.)
We held the second confession inadmissible on these grounds.
The lower federal courts also take a similar approach. See, e.g., Knott v. Howard, 511 F2d 1060 (1st Cir 1975); Gilpin v. United States, 415 F2d 638 (5th Cir 1969). Knott, in analyzing the admissibility of a third confession which followed two inadmissible ones, stated:
«* * * Here the district court correctly held that there was no taint connected with the [third] confession, because it was removed in time and place from the prior inadmissible confessions * * 511 F2d at 1061.
Knott also emphasized (1) that the third confession was voluntary and not the product of interrogation; and (2) the first two confessions were inadmissible solely because of Escobedo v. Illinois, 378 US 478, 84 S Ct 1758, 12 L Ed 2d 977 (1964), and not because they were coerced or involuntary. In light of all these circumstances, Knott found the third confession admissible.
The passage of time and a change in the place of interrogation are the most important factors to be considered along with the others noted in Knott in determining whether the subsequent confession was the product of a prior inadmissible confession.
B. Application of the Above Factors to this Case.
The state’s argument in this case regarding the defendant’s telephone-conversation confession is framed around the Wong Sun two-step test. First, it argues that the telephone conversation was neither instigated nor produced by the earlier confession. Second, it argues that the police obtained the telephone confession as a result of investigative techniques which would have been employed regardless of *[873] whether the earlier confessions had been heard. In essence, the state appears to be claiming that the second confession was "untainted” by the earlier confession and was "inevitably” obtained from an independent source.
Applying the principles used by courts to analyze consecutive confession cases to the facts here yields the result that the second telephone confession was tainted by the first. Although a Miranda warning was given to defendant preceding his telephone-conversation confession, the conversation took place almost immediately after his initial confession to police. In addition, it took place within the same police station as the initial confession. Under Westover v. United States, United States v. Bayer, and State v. Garrison, all supra, these two facts are sufficient to find defendant’s second confession tainted by his first. Although the telephone-conversation confession was voluntary, and the first confession was not coerced — factors in favor of admission of the former under Knott — the extremely limited time interval between the two confessions in this case mandates suppression of the telephone confession.
The state’s argument that defendant’s telephone confession was obtained as a result of investigative technique which would have been employed regardless of whether a prior confession had been obtained is not supported by the facts. Defendant originally told the police that he wished to go home to talk to his parents before speaking to the police about his involvement in the homicide. The police would have never had the opportunity to hear defendant’s telephone conversation if he had not confessed. Only after the police elicited the initial inadmissible confession did defendant change his mind and request to call his parents from the police station: Defendant asked the police if he could talk to his parents if he described the nature of his involvement in the homicide. The telephone conversation was a condition to defendant’s initial inadmissible confession.
*[874] In view of all these facts it cannot be said that the telephone call, in the language of State v. Garrison, supra, 21 Or App at 157, "would have inevitably” been made in the absence of the initial confession. The inevitable-discovery exception to the "fruit-of-the-poisonous-tree” doctrine requires the state prove that the evidence in question would inevitably, without speculation, be discovered. Defendant’s statement that he wanted to leave the police station in order to call his parents before speaking to police makes impossible proof of the inevitability of defendant’s phone call at the police station. Consequently, the telephone conversation should be suppressed as the fruit of the initial inadmissible confession.
Affirmed.

 Perhaps the best articulation for not using the subjective test can be found in People v. Rodney P. (anonymous), 21 NY2d 1,286 NYS2d 225,233 NE2d 255 (1967):
"[The objective] test * * * is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question * * 21 NY2d at 9.
*[859] An objective test is justifiable if Miranda is viewed in terms of balancing the burdens of law enforcement against the rights of suspects. One commentator has contended:
"* * * Past application of a subjective standard of coercion has illustrated that * * * the police have found it difficult to structure their conduct so as to negate the possibility of judicial finding of coercion [in voluntary search cases] * * Note, Consent Searches: A Reappraisal after Miranda v. Arizona, 67 Colum L Rev 130, 146 (1967).

Were this a matter of first impression, a more logical approach to the problem of determining when a defendant is in custody would be to utilize a two-step subjective/objective test: (1) did the defendant believe that he was in custody; and (2) if so, would a reasonable person in the defendant’s situation believe he was in custody? Cf. Hicks v. United States, 382 F2d 158 (DC Cir 1967). In this case, we do have some evidence as to the defendant’s subjective belief about whether he was in custody. In response to a police question as to why he confessed, he replied, "because of the pressure of the investigation and the pressure within me.” Thus, step (1) of the proposed test would be at least cursorily satisfied in this instance. Our application of step (2) may be found in the text of our opinion.

"If a search or seizure is carried out in such a manner that things seized in the course of a search would be subject to suppression, and if as a result of such search or seizure other evidence is discovered subsequently and offered against a defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes by a preponderance of the evidence that such evidence would have been discovered by law enforcement authorities irrespective of such search or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of ORS 133.525 to 133.703.” ORS 133.683.