Argued and submitted June 17, affirmed September 8, 1981

# STATE OF OREGON,
## *Appellant,*

*v.*

# DALE LANE MASON,
## *Respondent.*

## (C 80-03-30821; CA 18222)

633 P2d 820

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Dave Frohnmayer, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Nely L. Johnson, Metropolitan Public Defender, Portland, argued the cause and filed the brief for respondent.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

The state appeals from an order suppressing statements made by defendant to the police between February 19, 1980, and March 3, 1980. The state contends that until defendant was formally placed under arrest on the latter date he was not in custody and his statements prior to that time were freely and voluntarily made. We affirm.

On February 19, 1980, defendant, who has been deaf since birth, was living at the residence of Jerri Chepela, the homicide victim in this case. On the morning of that day, defendant went to the house of a neighbor and indicated, by gesturing and passing notes back and forth to the neighbors, that he had discovered that Mrs. Chepela had been seriously injured and he had seen a black man running away from the house. One of the neighbors went to the Chepela residence, found Mrs. Chepela barely alive and called the police. Several officers arrived shortly after 9 a.m., and defendant directed them into the house. One of the officers took defendant into the kitchen, at which time it was ascertained that he was deaf.

Shortly thereafter, Detectives Taylor and Newberg arrived and took over the questioning. A police employee, Adele Boeglin, attempted to interpret for Detective Taylor, using some finger spelling, but it became apparent that she was not able to communicate with defendant. After about one and one-half hours of attempting to question defendant, Taylor handed defendant the following note:

> "I want you to go downtown to my office and talk some more: okay? Two detectives will give you a ride right now."

Defendant nodded and was taken to the police station about 12:45 p.m. At the police station, defendant was placed in a room; Ms. Boeglin was with him and gave him a can of soup, which was all the food he ate that day.

At about 2 p.m., Dr. Sandra Green, a psychologist contacted by the police to act as an interpreter, arrived. After being informed by the detectives that defendant was a suspect, Dr. Green was asked to talk to defendant and find out what happened. Detectives Newberg and Taylor considered defendant a suspect at that point, although

Taylor indicated that defendant was not a "primary suspect." At that time, defendant repeated that he had seen a black man run from the Chepela house.

Approximately 45 minutes later, Detectives Newberg and Taylor took defendant and Dr. Green to an interview room, at which time the detectives considered that defendant should be advised of his constitutional rights as required by *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). They showed Dr. Green a *Miranda* rights form and asked her to translate the contents into sign language. She spent approximately 30 minutes attempting to communicate to defendant his *Miranda* rights, but concluded that defendant did not understand them. The detectives pushed the *Miranda* form toward defendant to have him sign it, but Dr. Green told them she felt he did not understand that he had some choices. The detectives acceded to her request that she ask defendant directly if he wanted a lawyer, to which defendant responded: "Yes. Better lawyer, I think. Better lawyer."

At that point, the detectives left the room, but a few minutes later they returned to ask defendant if he would give them his clothes and boots. His response was, "Okay." The officers took his boots and left defendant and Dr. Green in the interview room.

Dr. Green testified that the atmosphere at the police station was intimidating. There were doors requiring locking and unlocking whenever anyone moved in or out of the interview room, and there was a feeling of secrecy created by people leaving the room to speak privately; there were also long waiting periods without information about what was transpiring. While at the police station, defendant asked permission for everything he did, including permission to go to the bathroom, on which occasions he was escorted back and forth by the detectives.

Sometime after 5:30 p.m. on February 19, the detectives returned to the interview room without defendant's boots, and told defendant they were going to take him home. They drove him to the Chepela house and, upon arrival, defendant asked permission to run across the street because he was wearing only socks and did not want to get his feet wet. The detectives gave him that permission. The

detectives asked him to change his clothes so that they could take the ones he was wearing; defendant complied. They asked him to stay around for the next three days or so, so they could talk to him some more. Defendant asked if he could go to his class the following evening, but the detectives declined to give him permission, telling him he should stay around the house. Defendant asked for permission to look at his mail, which was granted. He asked for permission to stay in the trailer house where he had been living, but was told he could not do so because the house would be sealed and he would not have access to a bathroom or kitchen. Defendant then asked if they would call his mother to see if he could stay with her; that was done. In short, both detectives agreed that defendant did not do anything without asking their permission.

On at least one occasion between February 19 and February 23, the two detectives were parked in a police car across the street from defendant's mother's house where defendant was staying. During that period, the detectives telephoned the house twice and stopped by on one occasion.

On February 23, 1980, Detectives Newberg and Taylor went to defendant's mother's house to interview defendant without an interpreter. They arrived at about 10:15 a.m. The interview took place in the dining room where the two detectives and defendant sat at the dining room table; defendant's mother and a friend sat on a living room couch across the room where they remained for the duration of the interview. The detectives started the interview by writing to defendant the following note:

"The last time we talked you had asked for a lawyer — some other questions have come up about John — can we now talk to you?"

Defendant responded with a nod and: "He is deaf." The "John" referred to was John Chepela, the victim's husband, in whom the detectives asserted an interest. The interview continued by writing notes. A few of the questions asked defendant related to John but contained suggestions that John had paid defendant to kill Mrs. Chepela. The remaining questions focused on defendant as a suspect.

At the end of the interview, defendant was asked if he knew what a polygraph test was and if he had ever

taken one. He responded in the negative. The detectives wrote:

> "We want to give this test to everyone that is involved in this — knows Jerri. Will you take this test — maybe next week sometime?"

Defendant nodded in the affirmative, although Detective Taylor agreed that he did not tell defendant that he had a choice not to take the test.

On February 26, the detectives picked up defendant at about 10:15 a.m. and transported him, his mother and a friend to the police station. They were all taken to an interview room where one or both of the detectives remained with them at all times until a new interpreter, Ms. Christensen, arrived. Ms. Christensen spoke a few sentences to defendant in sign language and determined his language level to be "low verbal Ameslan." (American Sign Language.) Ms. Christensen attempted to interpret the *Miranda* rights to defendant, which took her approximately 10 minutes. The polygraph consent form was explained by the polygrapher and took 10 to 15 minutes to interpret. Defendant signed both forms.

Thereafter, defendant was taken to the polygraph room alone, strapped in a straight-back chair, told not to move or to use his hands and that his answers to questions had to be verbalized. The result of that test was inconclusive. Defendant was at the police station that day for about seven hours, with no lunch break. He was asked to take another polygraph test, to which he assented after he was told by Detective Taylor that he was being untruthful, or inconsistent, about some aspects of his story.

On March 3, 1980, defendant was picked up again by Detectives Taylor and Newberg and taken to the police station. On that occasion, he was taken directly to the polygraph room, where the police provided a fourth interpreter, Connie Allen. Ms. Allen asked defendant to read and sign both the *Miranda* rights form and the polygraph consent form, which defendant did without Ms. Allen's translating the contents of the forms into sign language.

Following the second polygraph examination, defendant was told that he had not been truthful and the

polygraph examiner began questioning him further. Later, Detectives Newberg and Taylor took over the questioning and recorded the interpreter's version of what defendant is reported to have said. They concluded their questioning after defendant apparently made incriminating statements, at which time he was placed under arrest.

The following day defendant gave an additional statement, the inadmissibility of which is not challenged by the state in this court.

We agree with the state, as did the trial court, that defendant was not in custody while being questioned at the scene of the crime. The question is whether the situation changed significantly when defendant was taken to the police station. Because the trial court concluded that defendant was in custody at that time, we accept the historical facts inherent in that conclusion which are supported by the evidence, including the inferences which may be reasonably drawn therefrom. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968); *State v. Holt,* 291 Or 343, 630 P2d 854 (1981).

■■ The mere fact that defendant was taken to the police station for further questioning did not result in his being in custody, even if the atmosphere was somewhat coercive. *Oregon v. Mathiason,* 429 US 492, 97 S Ct 711, 50 L Ed 714 (1977). The state contends defendant was not in custody until he was formally arrested. Although the difference between being in custody and being under arrest is a murky one, it is clear that if the defendant, short of being placed under arrest, was "otherwise deprived of his freedom of action in any significant way," his status may have become custodial. *Miranda v. Arizona, supra.* In *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den* 282 Or 189 (1978), we attempted to summarize the more significant factors used to determine whether a custodial situation existed. In capsulized form, those factors are: (1) whether defendant could have left the scene of the interrogation voluntarily; (2) whether defendant was questioned as a suspect or merely as a witness, and (3) whether defendant freely and voluntarily accompanied the police to the place of his questioning. 31 Or App at 860-1.

■    The record here supports the following factual findings, although the trial court's findings[1] were articulated differently:

1.   Defendant did not freely and voluntarily accompany the detectives to the police station—he was told that the police wanted him to go there and that two officers would take him. Although he did not resist, he was not advised that he had a choice.

2.   Defendant was questioned as a suspect, not merely as a witness.

3.   Defendant could not have left freely and voluntarily; he was put in a small room and reasonably believed that he needed permission to do anything. He was not told that he was not under arrest; neither was he told that he could leave at any time, and he did not believe that he could. Whether the doors to the room were locked is not clear, but it is clear that one could not leave the police station without going through locked doors.

Those facts support the trial court's conclusion that defendant was in custody when he was questioned at the police station. *State v. Paz, supra; see State v. Warner,* 284 Or 147, 585 P2d 681 (1978). The detectives apparently treated the situation as being custodial; they advised him of his rights as required by *Miranda* prior to custodial interrogation.

When defendant indicated he wished an attorney, the detectives ceased questioning him, except to ask him if they could take his boots and clothing. The state does not contest the suppression of that physical evidence. Although the state appears to concede that it was improper to ask defendant's consent after he had asserted his desire for

---

[1] With respect to custody, the trial court found:

"* * * However, when he was subsequently taken to the police station he was, I find, placed in a custodial atmosphere. All of the evidence suggests that he thought his freedom was curtailed; his requests for permission addressed to the officers confirm this; and the very length of the interrogation emphasized it. At this point, Miranda warnings were in order, and the police properly so recognized. For the reasons previously stated, I do not believe the warnings were interpreted in a manner adequately comprehensive to the defendant. Even so, at the conclusion of the warnings when he was asked by Sandra Green if he wanted a lawyer, he replied in substance that he did."

counsel, a concession (if it is one) of that kind does not necessarily resolve the problem. It does suggest, however, that the state agrees that even if the defendant was not in custody at that time, his expressed desire for counsel changed the permissible course of the investigation.

We are not aware of any cases which deal expressly with that point.[2] It is clear, however, that a person not in custody may assert his right to remain silent under the Fifth Amendment to the United States Constitution or to his right to counsel under the Sixth Amendment, even though he is not entitled to specific advice as to those rights. *Oregon v. Mathiason, supra.* We need not decide the extent to which permissible police conduct toward a defendant in custody who has asserted his rights differs from that toward a defendant not in custody who has asserted the same rights. In either situation, the defendant may waive the rights he asserted, but the state has the burden of proving the waiver was voluntarily and knowingly made. *State v. McGrew,* 38 Or App 493, 590 P2d 755, *rev den* 286 Or 149, *cert den* 444 US 867 (1979). Assuming that the police may attempt to persuade a defendant to waive his asserted rights if he is not in custody, they may not do so if he is in custody: once the person in custody has invoked his Fifth Amendment rights, those rights must be scrupulously honored. *Miranda v. Arizona, supra.*

In its most recent pronouncement, the United States Supreme Court held that in order to show a waiver of Fifth Amendment rights by a defendant who has been charged and is in custody, the state must show that *defendant* initiated further communication with the police once he has expressed the desire to deal with the police only through counsel. *Edwards v. Arizona,* 451 US 477, 101 S Ct 1880, 68 L Ed 2d 378 (1981). In that case, defendant was charged and lodged in jail. Although he denied involvement in the crime, he sought to "make a deal." The police indicated they did not have authority to do

---

[2] The trial court concluded defendant was entitled to have counsel appointed for him at the time he indicated he wanted a lawyer and to have counsel present at all interrogation unless and until defendant waived that right. We need not, and do not, decide that question here. As in *Edwards v. Arizona,* 451 US 477, 101 S Ct 1880, 68 L Ed 2d 378 (1981), we view defendant's request for counsel as invoking his Fifth Amendment rights.

that, but asked defendant to give them a statement. Defendant said he wanted an attorney before "making a deal," at which point the questioning ceased. The next morning, however, the police asked him again to make a statement, and ultimately he did so. The court treated defendant's desire to deal only through counsel as an assertion of his Fifth Amendment rights, rather than his rights under the Sixth Amendment.

The court stated its holding as follows:

"Second, although we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, see *North Carolina v. Butler, supra,* at 372-376 [441 US 369, 99 S Ct 1755, 60 L Ed 2d 286 (1979)], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. [Footnote omitted.] We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities unless the accused himself initiates further communication, exchanges or conversations with the police." 68 L Ed 2d at 386.

Here, as in *Edwards,* defendant's expressed desire for counsel was an invocation of his Fifth Amendment rights; however, defendant had not been charged at the time he invoked them and was not detained in jail when he was approached by the detective four days later. Assuming that defendant did not remain in custody after the police took him to his mother's home the evening of February 19 (even though the police purported to impose significant restraints on his freedom), and that it was permissible for the detectives to initiate re-interrogation of him if he were willing to waive the rights he had invoked, the state had the burden of proving that the defendant freely and voluntarily waived those rights. If that were not the case, the police could simply release a person from custody after he asserted his rights and later re-interrogate him without any concern over whether he had waived those rights.

■ It is at this point in the analysis that defendant's status as being, or having been, in custody or not becomes material: if he was never in custody, there was no requirement that the police advise him of his rights; if he was in custody, they were required to do so. Given our conclusion that he was in custody at the police station on February 19, he was entitled to *Miranda* warnings; in order to have waived them, he must be found to have understood them. The most that can be said is that defendant apparently understood he was entitled to have a lawyer; if so, could have waived that right. But the trial court's findings encompass more than that, particularly the right to remain silent and the right to have his lawyer present during interrogation. Again, we are bound by the trial court's findings, which are supported by the evidence, that none of the interpreters used by the police was able to communicate accurately in defendant's own language the concepts contained in *Miranda* warnings and that defendant did not understand them.[3] Accepting those findings, we agree with the trial court's conclusion that defendant did not waive his rights on February 23.

---

[3] The relevant findings are:

"7. Dale Mason, the defendant, was born prematurely, congenitally deaf, and with a club foot. His mother from the beginning took him to the University of Oregon Health Sciences Center, and his medical history is well documented. The defense presented three expert witnesses obviously concerned with and sympathetic to deaf persons, but whose qualifications to deal with deaf persons were unchallenged and whose testimony was clear, unequivocal and uncontradicted. The defendant is a prelingually deaf person. His mother is a hearing person. He received some oral or lip reading training in school, but no training in sign language until the age of 14. His intelligence as measured by non-verbal tests is roughly average. Unlike most children who learn their primary language by the age of 5, he learned none, except in a most rudimentary sense. He did not begin to learn a sign language until 14, and in his case it was American Sign Language. American Sign Language is a language entirely distinct from our standard written and spoken English, with its own syntax and grammar. He has learned to converse at a simple conversational level in American Sign Language. His ability to speak in Signed English, which is a different sign language tending to replicate English syntax, is described by expert witnesses as a baby talk level. His command of written standard English as is evidenced by his written notes and his statements is simple and fragmentary.

"8. I conclude from the evidence that while all four interpreters used by the police could, in one way or another, communicate with the defendant at a rudimentary level and receive from him simple responses and a sequential narrative of sorts, none of them possessed the training and expertise to interpret accurately in defendant's own language the concepts contained in

■    The same is true with respect to defendant's submitting to the two polygraph tests, the explanation of which was more complicated than the advice of rights. Accordingly, we also agree with the trial court's conclusion that defendant did not waive his rights at the time of either polygraph examination.

Affirmed.

---

the Miranda warnings. This defendant by reason of his lack of hearing has never been exposed to the commonplace materials of history, past or present, which give the Miranda warnings meaning for the simplest citizen who possesses sufficient attention span to watch television. His previous criminal case which involved a plea of guilty was not sufficient to provide for such background. The evidence here indicated that his lawyer who acted as his interpreter on that occasion knew no American Sign Language and conversed with him largely using finger spelling and Signed English. He also employed incorrect signs for important words such as 'rights.' Indeed, there was no evidence that Miranda warnings were given him on that occasion. To give Miranda warnings to this defendant so as to make an intelligent waiver possible would require an interpreter familiar with and competent in his primary language. This he did not have. Even more technically difficult would have been explanation of a polygraph examination and the interpretation of questions in a comprehensible manner for that examination."