Argued and submitted December 14, 1981, reversed and
remanded for trial April 12, 1982

STATE OF OREGON,
*Appellant,*

*v.*

CHARLES EDWARD TYSON,
*Respondent.*

(No. C81-02-30835, CA A21188)

643 P2d 396

Virginia L. Linder, Assistant Attorney General, Salem,
argued the cause for appellant. With her on the brief were
Dave Frohnmayer, Attorney General, and William F. Gary,
Solicitor General, Salem.

Stephen J. Williams, Deputy Public Defender, Salem,
argued the cause for respondent. With him on the brief was
Gary D. Babcock, Public Defender, Salem.

Before Richardson, Presiding Judge, and Thornton and
Van Hoomissen, Judges.

THORNTON, J.

.

## THORNTON, J.

The state appeals from an order of the circuit court suppressing all statements made by defendant while in the custody of the police.

The essential facts are quite lengthy and may be summarized as follows.

Portland police received information around 3 p.m. from a local hospital that a man later identified as defendant was in its emergency room with a gunshot wound in his arm. While waiting at the hospital to interview defendant, Officer Cook received word that there had been a burglary at a residence near the hospital and that the burglar might have been shot. Cook then went to the scene of the reported crime and questioned the householder, who confirmed the break-in and said that he might have shot the would-be burglar. After returning to the hospital with the householder, Cook was allowed to interview defendant.

Defendant was in a recovery room, lying down. His arm was bandaged, and there was a yellow disinfectant-type fluid on the bandage. Defendant did not appear to the officer to be in a condition to get up and walk out, but he was conscious and aware that the officer was in the room. No one else was in the room at that time. Defendant did not make any reference to being in pain, but he appeared to Officer Cook as though he might possibly be in some pain. It did not appear to Officer Cook that defendant was under the influence of any sedating or pain-killing medications.

Officer Cook, who was in uniform, spoke with defendant at about 3:30 p.m. He identified himself, advised defendant of his rights and asked defendant if he had any knowledge of a burglary. In advising defendant of his rights, the officer read defendant the *Miranda* rights card that he kept in his notebook. When the officer asked defendant if he understood his rights, defendant did not indicate whether he understood them, but, instead, responded with an explanation of how he was shot. The officer could not recall whether defendant made this statement immediately after the advisement of rights, or after the officer advised defendant that he was investigating a burglary. Defendant's statement, however, followed within a minute of

the advisement of rights, and defendant did not request a lawyer or assert his right to remain silent.

Defendant's explanation was that he was walking down Union Avenue in front of an 88 Cent Store, when he heard some shots and realized that he had been hit. Defendant then ran to the hospital, a distance the officer estimated to be about half a mile.

Officer Cook did not indicate to defendant that defendant was under arrest or that he was going to be placed in custody. Officer Cook considered defendant a suspect in the burglary at the time of the questioning, but his only objective at that time was to bring the householder in for identification purposes and to have the detectives respond to the situation. According to the officer, whenever there is someone injured or possibly involved in a crime as in this instance, detectives are called in. Officer Cook indicated that, under these circumstances, he would not have made an arrest.

Officer Cook left the room and waited for the detectives to arrive. They arrived about 45 minutes to an hour later. During this time, Officer Cook did not go back into the defendant's room and, to the officer's knowledge, no other police officers entered defendant's room. Detective Newman arrived at the hospital at about 4:30 p.m. Detective Newman first met with Officer Cook and another officer in order to be briefed on the facts. Next, the detective talked to defendant's cousin, Hollis Tyson, who gave him some information about the shooting. Defendant's cousin told the officer that another person, Rodney Jones, had told him that defendant went into a house and had been shot. The detective also talked to defendant's mother.

Detective Newman then talked briefly with defendant. When the detective entered the room, two women who were friends or relatives of defendant were present. The detective vaguely recalled that one of them mentioned that she was defendant's sister. Detective Newman could not recall whether the women present voluntarily left the room when he came in or whether he asked them to leave, but he thought that they volunteered to do so. He then spoke to defendant for no longer than 15 minutes.

When the detective entered the room, defendant was conscious and appeared alert. There was a bandage on his right arm. Defendant did not appear to be under the influence of alcohol, drugs or medication. With the exception of the physical injury to defendant's arm, defendant did not appear to have any physical impairments. He also did not appear to have any sort of mental disorder.

Detective Newman introduced and identified himself, and he asked defendant what happened. The detective testified that he did not advise defendant of his rights, because he did not consider the setting to be custodial. The detective did not believe there was any need to arrest defendant, inasmuch as defendant's relatives had been very cooperative and seemed willing to help locate defendant later if that became necessary. Also, the detective did not know the extent of defendant's injuries. If defendant were admitted to the hospital as an inpatient, placing him under arrest would require that he be moved to another hospital and provided with an armed guard. Such procedures seemed unnecessary to Detective Newman at that time.

At or near the beginning of the interview, Detective Newman told defendant that he was not under arrest and that he would not be arrested at that time, although he could be arrested at a later date. Defendant first gave Detective Newman substantially the same explanation of how he was injured that he had given Officer Cook. The detective told defendant that he did not believe defendant's story because of the information that he had from defendant's cousin and mother. He further explained that, if defendant wanted to straighten out his life, it would be important for him to admit that he was wrong and start taking some positive steps to change his life. Defendant agreed that he should do that, and he then told Detective Newman that he was an unemployed, part-time carpenter and that he often went into vacant houses to take things to be resold or to determine who the owner was so that he could be hired as a fix-up man. Defendant said that he had gone around the particular residence in question, found the back door unlocked and gone inside. As he did so, he noticed the pants leg of the person who lived there and turned around and ran. When he did, he was shot in the

right arm. After defendant got outside, he told a friend that he had been shot, and ran to the hospital.

After defendant explained what had happened, some additional brief conversation followed between the detective and defendant. One of the last things defendant said to the detective was that his arm hurt and he was uncomfortable. The detective said he would tell the nurse and see if the medical staff could give defendant something for the pain. The detective then told defendant that he might be contacted again or arrested at a later date, and he left the room. The detective got the nurse and sent her in to see about taking care of defendant.

Detective Newman called the hospital later that night, at about 9 p.m., after writing his report. He talked to the nursing staff, and they told him that defendant had been released. Detective Newman's intent never was to arrest defendant, even though he thought he had sufficient information upon which to base an arrest. Rather, the detective presented the information from the investigation to the district attorney and sought a warrant for the arrest. Defendant was not arrested until three or four days after the interview at the hospital.

The rationale of the trial court's oral ruling was this: While the court found that defendant was advised of his rights by Officer Cook, the court could not satisfy itself that "the State has shown that he understood his rights before he waived them."

From the above facts, which essentially are not disputed by defendant, we conclude that the trial court erred in its initial legal determination, namely in that the interrogation of defendant at the hospital by Officer Cook and Detective Newman was custodial and thus subject to the *Miranda* requirements. Where the facts are undisputed, it is axiomatic that the issue before the court is purely one of law. Contrary to the conclusion reached by the trial judge, we are satisfied that defendant was not, as a matter of law, in custody within the meaning of *Miranda* at the hospital. *Oregon v. Mathiason*, 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977). As the Supreme Court said in *Mathiason:*

"\* \* \* Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' \* \* \*" 429 US at 495.

Here, defendant was in the emergency room of his own volition. His family was at the hospital. He had friends who were also there visiting him. He did leave the hospital later. There is no evidence that the police would have detained defendant at the hospital had he attempted to leave. Furthermore, there is no evidence that either officer intended to arrest defendant at the hospital. As we observed in *State v. Crossen,* 10 Or App 442, 449, 499 P2d 1357, *rev den* (1972):

"\* \* \* As we read *Miranda* and its progeny, \* \* \* the term 'focal suspect' no longer has much, if any, significance, because those opinions tell us that *the police are not required to give Miranda advice to an individual at the moment they have probable cause to believe he may be guilty of a crime* — that the *Miranda* advice is required only when the interrogation is 'custodial.'" (Footnote omitted; emphasis supplied.)

*See also State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den* 282 Or 189 (1978).

We hold that the trial court erred finding the interrogation custodial and in granting defendant's motion to suppress the evidence.

Reversed and remanded for trial.