Argued April 25, affirmed August 22, reconsideration denied
October 10, 1978, petition for review denied January 23, 1979

STATE OF OREGON, *Respondent,*
*v.*
BILLY RAY MITCHELL, *Appellant.*
(No. C 77-06-07820, CA 9533)

583 P2d 14

Stephanie A. Smythe, Deputy Public Defender, Salem, argued the cause for appellant. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Donald L. Paillette, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Al J. Laue, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton, Tanzer and Buttler, Judges.

BUTTLER, J.

**BUTTLER, J.**

Defendant appeals from his conviction and sentence for rape and sodomy, the principal assignment of error being the failure of the trial court to suppress statements made by defendant during his initial encounter with the police before any *Miranda* warnings were given. He also assigns error to the recommendation of the trial court that defendant not be paroled, and the imposition of consecutive 20-year sentences for the two crimes. We affirm.

I

At 3 a.m. on the morning of June 4, 1977, two Multnomah County Sheriff's deputies received a call reporting a rape having occurred in Southwest Portland. They went to the scene of the crime and obtained a description of the assailant from the victim: a male negro with a brown, glistening face and wearing a shiny jacket with a long zipper. They recalled that they had observed a man, whom they described as a male negro with a stocky build, a roundish face, shiny skin, wearing a dark colored watch cap and a zippered coat, three or four blocks from the scene of the crime at about 1 a.m. that morning. Their curiosity was aroused at that time because they were surprised that someone would be out in the rain without a raincoat, so they proceeded slowly past the man in their patrol car. The man did not look at the police officers and kept walking, but they observed the man for approximately five to ten seconds.

After talking to the victim, they broadcast the description of the suspect, and two Portland police officers, who had taken the description over their radio, encountered defendant at approximately 5:15 a.m. They stopped alongside of defendant at 35th and Barbur Boulevard, approximately 1½ to 2 miles from the scene of the crime, because he matched the description of a male negro, with a stocky build, wearing a stocking cap. The officers were in uniform

and were in a marked patrol car; the overhead flashing lights were not on, and the spotlight was not on. Both officers got out of their car and asked defendant where he had been during the previous evening. Defendant stated he was "downtown" and that he had been picked up by two white women, who were strangers to him, who took him to a house in Southwest Portland in a red car. Defendant stated that he could remember no more because he and the women had been drinking.

The officers questioned defendant for approximately two minutes, and after he responded as indicated above, he was placed under arrest for rape, handcuffed and taken in the patrol car to the scene of the crime. There was no conversation during the ride. When the officers arrived at the scene of the crime, defendant was advised of his *Miranda* rights, stated that he understood them and was willing to talk. He was asked to repeat a phrase the victim remembered the assailant saying, whereupon the victim identified defendant as the assailant, stating, "[I]t sounds like him."

At the time of the initial contact with the victim, the deputies were told that two twenty dollar bills and at least one two dollar bill were missing from her purse after the assailant left; the bills had been folded in half. Money found in defendant's wallet at the scene was separated as follows: One hundred eighty dollars (the bills folded three times) was found in one section of the wallet, and forty-three dollars (two twenties, one two dollar bill and one one dollar bill) was found in a separate section of the wallet. These bills were also folded three times, but were creased in the middle as well, and the middle crease was the more pronounced one.

Following his arrest, and after he had been advised of his rights, defendant reiterated his statement that he had been picked up in downtown Portland by two white women in a red car who took him to a house somewhere in Southwest Portland.

While the statement on its face appears to be exculpatory, it linked the defendant to a house in Southwest Portland in which two white women lived, with a red car in the driveway. That information, together with the description the police officers had received over their radio, gave them probable cause to arrest and search defendant. More importantly, the state was able to prove at trial that defendant's statement was false; in fact, he had taken a particular bus from the area of his home to the area where the crime was committed. That evidence was highly prejudicial to defendant, particularly in light of the fact that the victim could not make an in-court identification of him.

## II

■ Defendant's principal contention is that when the officers stopped on the street to ask him some questions, he was in custody, and anything he said prior to being advised of his rights pursuant to *Miranda,* should have been suppressed, and any incriminating evidence subsequently obtained which derived from those statements should also have been suppressed as "fruit of the poisonous tree." *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963). *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966), holds that a statement stemming from "custodial interrogation" is inadmissible in evidence unless the defendant, prior to interrogation, is advised of his right to remain silent, right to counsel, etc. The rule applies to

> "* * * questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. * * *" 384 US at 444.

Defendant contends that the police questioning of him comes within the *Miranda* prohibition because he meets all of the tests set forth by this court in *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den* 282

Or 189 (1978), to determine when a defendant is "in custody." In *Paz* we said:

"In making determinations of whether a defendant was 'in custody' for the purposes of *Miranda,* we have looked to at least three specific circumstances surrounding a defendant's interrogation.

"First, we often examine whether the defendant could have left the scene of the interrogation voluntarily. * * *

"Second, we often focus on whether the defendant was questioned by the police as a suspect or merely as a witness. * * *

"Finally, we look to whether a defendant freely and voluntarily accompanied police to the place of his questioning. * * *" 31 Or App at 860.

There is no doubt that defendant was questioned as a suspect rather than as a possible witness. He met the general description of the suspect given the police over the radio, and he was in the general area of the scene of the crime walking in the rain without a raincoat during the early hours of the morning. That fact has evidentiary value in determining whether the interrogation was custodial, *State v. Crossen,* 10 Or App 442, 499 P2d 1357, *rev den* (1972), but, in and of itself, is not dispositive.

Since the defendant was questioned on the street and not taken anywhere until after his arrest, the final factor mentioned in *Paz* is not relevant.

Defendant's emphasis is on the first factor we discussed in *Paz*—he could not have left the scene of interrogation voluntarily. There is no contention that the police said or did anything to defendant which would reasonably cause him to believe they would hold him against his will. At the suppression hearing, however, the following colloquy occurred between defense counsel and one of the arresting officers:

"Q  If Mr. Mitchell had indicated a willingness to continue walking down the road and not responding to questions, would you have permitted him to do so?

[ 814 ]

"A Probably not until we questioned him.

"Q If he had refused the question, you would not have permitted him to leave; is that correct?

"A No."

Based upon that testimony defendant contends he was not free to leave, and therefore was in custody. The questions put to the officer were hypothetical, however, and present what might be characterized as an anticipatory custody in the event certain events, which did not arise, occurred. The officer testified that the defendant was cooperative. We do not know, for example, whether defendant would have been held if he had told the officers he had spent the evening at a nearby tavern and pool hall. For all we know, the officers might have taken defendant's name and address and told him they would be in touch with him later. Further, a majority of the court in *Paz* held that the test as to whether a person could leave the place of interrogation voluntarily was whether a reasonable person would reasonably conclude that he was being held against his will. There is no evidence in this case as to what defendant thought. In light of what occurred, it would not be unreasonable to conclude that defendant thought that if he gave an exculpatory answer to the police questions, he would be free to go.

The question, then, becomes more narrow: may the police stop a person on the street in a reasonable manner and for a reasonable time for the purpose of making a reasonable inquiry, when the police reasonably suspect the person has committed a crime? ORS 131.615,[1] on which neither party relies, or cites, authorizes such police action, and while the statute is

---

[1] ORS 131.615 provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

presumed to be constitutional, it is subject to constitutional limitations. It was enacted following the United States Supreme Court's decision in *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), and is more restricted than *Terry* would have permitted.

While *Terry* is strictly a Fourth Amendment case, it is implicit in the Court's decision that the initial stop of the defendant for the purpose of making a reasonable inquiry into suspicious conduct was permissible, because the rationale of the ensuing pat-down search of Terry for weapons was that the officer was entitled to make the limited reasonable search for his own protection. In *Terry,* the "seizure" of the defendant occurred when the officer "took hold of him and patted down the outer surfaces of his clothing." 392 US at 19. Accordingly, we are not confronted here with a situation which would be a "seizure" of the person under the Fourth Amendment to the United States Constitution, requiring a decision as to whether such a seizure amounts to custody or to a deprivation of freedom in a significant way requiring pre-interrogation warnings

---

[2]The last paragraph of the majority opinion in *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), includes the following statement:

"* * * We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. * * *" 392 US at 30-31.

Mr. Justice Harlan, concurring, stated:

"* * * There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet." 392 US at 33.

Mr. Justice White stated in his concurring opinion:

"* * * But if the investigative stop is sustainable at all, constitutional rights are not necesarily violated if pertinent questions are asked and the person is restrained briefly in the process." 392 US at 35.

[ 816 ]

for the purposes of the Fifth Amendment to the United States Constitution.[2]

In the case at bar, defendant's initial encounter with the police was about as unobtrusive as possible. While there were two uniformed police officers involved, there were no flashing lights, siren or spotlight, no drawn revolvers, no frisk or other physical contact; in short, there is no evidence that the brief two minute interrogation took place in a police dominated atmosphere having coercive overtones. *See State v. Evans,* 16 Or App 189 at 196-97, 517 P2d 1225, *rev den* (1974). A more compelling case for custodial interrogation in a "coercive environment" was presented in *Oregon v. Mathiason,* 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977), where the defendant was questioned in a closed room at police headquarters; yet the United States Supreme Court held the questioning to be noncustodial for purposes of *Miranda.*[3] The Court said:

> "* * * Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited." 429 US at 495.

There is no evidence here that the police intended to take defendant into custody or to arrest and charge him with the crime when they stopped to talk to him;

---

[3] The Court in *Oregon v. Mathiason,* 429 US 492, 97 S Ct 711 (1977), 50 L Ed 2d 714, did not hold that the confession was made freely and voluntarily, but only that preinterrogation *Miranda* warnings were not required.

they may have had sufficient cause for arrest, but it was a close question. It was not until defendant gave the answers he did to the police questions that the police decided to arrest him, at which time all questioning ceased until he was taken to the scene of the crime and read his *Miranda* rights prior to further questioning.

We hold that on these facts, the initial encounter between defendant and the police was investigatory and did not involve custodial interrogation until the police decided, on the basis of defendant's responses, that he should be arrested. Accordingly, the motion to suppress was properly denied.

## III

■ Defendant's second assignment of error is that the trial court did not have authority to recommend that defendant not be paroled. He contends that the recommendation is equivalent to a minimum sentence under ORS 144.110 (Oregon Laws 1977, ch 372, § 4) which may not be applied retroactively. There is no merit to the contention; the trial court's recommendation was just that, and was not, and was not intended to be, a minimum sentence. The court had authority to make the recommendation under ORS 144.210.[4]

■ Finally, defendant assigns error to the trial court's sentencing him for two crimes, rape and sodomy, because both offenses arose out of "the same course of conduct with one victim." That question has been

---

[4] ORS 144.210 provides:

"After a person convicted of a felony is committed to the legal and physical custody of the Corrections Division, the State Board of Parole shall obtain from the sentencing judge, the district attorney and the sheriff or arresting agency a statement of all the facts concerning such convicted person's crime and any other information which they may have concerning the convicted person. The sentencing judge, the district attorney, the sheriff and the arresting agency shall give the board such information and indicate to the board what, in their judgment, should be the duration of such convicted person's confinement. All such statements and information shall be made available to the Corrections Division."

resolved against defendant. *State v. Steele,* 33 Or App 491, 577 P2d 524 (1978); *State v. Kendrick,* 31 Or App 1195, 572 P2d 354 (1977), *rev den* 282 Or 385 (1978); *State v. Howes,* 14 Or App 436, 512 P2d 1357, *rev den* (1973). The rape and sodomy constituted two separate crimes, each of which is separately punishable.

Affirmed.

**TANZER, J.,** specially concurring in part; concurring in part.

I specially concur in part I, but I believe it is over-analyzed (or, perhaps, under-analyzed, depending upon how one looks at it) in the sense that there is too much said. *Oregon v. Mathiason,* 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977), is entirely dispositive. There is no need for further citation or discussion and I would say no more beyond the citation to *Mathiason.* Hence, I concur separately to indicate that I do not necessarily concur in the additional comments of the majority.

Particularly, I understand the necessity for, but do not join, the attempt of the majority to distinguish the troublesome language from its earlier opinion of *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977) *rev den* 282 Or 189 (1978); whatever comfort that language gives defendant, this opinion takes away. These facts illustrate the correctness of my dissent in *Paz,* to which I resubscribe, which would have led the majority more directly to the same result without the necessity of wiggling away from precedential language.

I concur in part II.