Argued and submitted November 10, affirmed December 29, 1980,
reconsideration denied March 5,
petition for review denied March 24, 1981 (290 Or 652)

STATE OF OREGON,
*Respondent,*

*v.*

ANTONIO MIGUEL HERRERA,
*Appellant.*

(No. 76-278 C, CA 17047)

621 P2d 1209

Thomas J. Crabtree, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

W. Benny Won, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Before Gillette, Presiding Judge,* and Roberts and Campbell, Judges.

ROBERTS, J.

---

* Richardson, P. J., *vice* Gillette, P.J.

**ROBERTS, J.**

Defendant was convicted of the crime of murder. The conviction was affirmed in *State v. Herrera,* 32 Or App 397, 574 P2d 1130 (1978). The Supreme Court reversed and remanded for a new trial, 286 Or 349, 594 P2d 823 (1979). On retrial, defendant was acquitted of the murder charge but found guilty of the lesser included offense of manslaughter in the first degree. He assigns as error the denial of his motion to suppress statements made following incomplete *Miranda*[1] warnings and the denial of his motion for a mistrial after the state's witness testified that his previous testimony to police was supported by a polygraph test. We affirm.

On the evening of July 19, 1976, defendant, then 17 years of age and on parole from MacLaren School for Boys, was a passenger in a car in Klamath Falls which Steve Lerma was driving. Steve's brother, Phil, was also present. The three stopped and picked up a hitchhiker, Samuel Newman. Newman's body was discovered by passers-by on a dead-end street about 9:30 that evening. He had been stabbed numerous times.

On July 23, 1976, returning to the home of his foster parents, the Hargroves, defendant was told that Ray Howard, who is apparently the Juvenile Officer for the Klamath Falls Police Department, wanted to talk to him at the police station. Defendant went there to see him. At that time, defendant told Howard he and the Lerma brothers had been involved in a fight with some Indians on the night of July 19, 1976.[2] Howard asked to see the knife that defendant was then carrying, examined and measured it, and returned it to him. Defendant testified Howard told him he was not under arrest or charged with anything "yet," so he left the police station and hitchhiked home. Awaiting him at home were two more police officers. They asked him to accompany them to the police station and he

---

[1] *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

[2] Howard had perhaps heard the story of defendant's "fight" from another officer, Paul Arnett, who had run into defendant at a local grocery store and to whom defendant first told the story.

went voluntarily. They told him he was not under arrest. At the police station he was given his *Miranda* rights, but the recitation was apparently incomplete.[3] One of the officers told defendant they were investigating a murder. This officer testified at trial he believed then that the defendant "was involved" in the incident. Defendant again told the story of having a fight with Indians, and said he did not know about anyone being murdered. One of the officers then drove defendant home.

That night, Officer Arnett, whom defendant had run into the day after the incident and with whom he was apparently familiar, telephoned him at home and asked him if he wanted to meet the next day to talk. Defendant agreed. The two set up a time to meet at a park. The next morning, instead, defendant contacted Phil Lerma and went with him and Mr. Hargrove to the police station, where they met with one of the officers defendant had gone to the station with the day before. Defendant testified he "shot some speed"[4] about 20 minutes before going to the police station; the police testified defendant was extremely agitated. At some point, defendant was separated from Phil and given a *Miranda* rights form, which was read aloud to him before he himself read and reportedly signed it.[5] This time he embellished the Indian fight story, adding that, chasing the Indians in their car, he and the Lermas stopped to pick up the body of a man which the Indians threw out of their car. They were going to take him to the hospital, defendant said, but when the victim died in the car, defendant and his companions panicked and threw him back in the street.

Early in the questioning, Officer Arnett, whom the defendant was to meet that morning, arrived at the station, saw defendant in the room, and entered. He began to advise

---

[3] Lieutenant Oscar Gerleve, who informed defendant of his rights, did not recall advising defendant of his right to court-appointed counsel, but only "that he did not have to talk to us there at the station, anything he said could be used against him in a court of law, that he had a right to have an attorney present before we talked to him, and that he did not have to answer any of our questions, he could stop anytime he wanted to during the interview, if he wished to talk to us."

[4] Injected amphetamines.

[5] There were no exhibits forwarded on appeal.

defendant of his rights, but was told he had already been so advised. Defendant was told he would feel better if he "got it off his chest." Defendant then asked to talk with Phil Lerma, and the two were left alone for about ten minutes. The police officers then entered the room the young men were in, and, with both men crying and being very emotional, Lerma confessed that he had stabbed Newman, then defendant confessed that he had done it, they argued back and forth and finally both decided that Lerma was the one who was responsible. Defendant was taken into custody on the afternoon of July 24, 1976, and taken to the Klamath County Juvenile Home.

On July 26, 1976, defendant was questioned by police at the juvenile home. They apparently gave him the same incomplete *Miranda* warnings initially given on July 23, 1976.[6] During this questioning, defendant told them he remembered picking up a hitchhiker and trying to stop Phil Lerma from stabbing the victim.

■ Defendant seeks to have all these statements suppressed, arguing that the *Miranda* warnings of July 23 and July 26 were incomplete, and that the confession of July 24 was therefore "fruit of the poisonous tree."[7] Police, however, are not required to administer *Miranda* warnings to everyone they question. These warnings are required only when the person is under such a restriction of freedom that he or she is "in custody" for all practical purposes. *Oregon v. Mathiason,* 429 US 492, 495, 97 S Ct 711, 50 L Ed 2d 714 (1977). We need not determine the consequence of any incomplete *Miranda* warnings on July 23, because we find that on that date defendant was not in custody of the Klamath Falls Police.

■ Defendant first went voluntarily to the police station that day in response to a phone message that Officer Howard wanted to meet with him. There is no indication, even taking into account his parole status, that defendant felt he was compelled to go to the station. Later, when he returned home and found two more officers waiting to

---

[6] *See* n 3, supra.

[7] *Wong Sun v. United States,* 271 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963).

question him, he testified he asked to go to the police station with them because he wanted to know what was going on. In *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den* (1978), we articulated a test for determining whether a reasonable person in defendant's position would have believed himself to be deprived of liberty in a significant way. In *Paz,* we listed three factors for consideration: (1) whether the defendant could have left the scene of the questioning voluntarily; (2) whether he was being questioned as a suspect or merely as a witness; and (3) whether the defendant accompanied the police freely and willingly to the place of questioning. Defendant's willingness to speak with the police that day adequately satisfies factor (3) as set forth in *Paz;* the most telling evidence fulfilling the requirement of the factor (1), that he might leave voluntarily, is that he *did* leave after questioning twice that day. It is not entirely clear whether, on July 23, defendant was being questioned as a suspect or merely as a witness; however, factor (2) is not dispositive of the question of custody. *State v. Mitchell,* 35 Or App 809, 583 P2d 14 (1978), *rev den* (1979). *Mathiason* makes it clear that it is the coercive environment, and not the suspicions of the police, which establishes the requirement for the protective *Miranda* warnings. We hold that where, as here, the defendant voluntarily presented himself at the police station to answer questions, *Miranda* warnings were not required. The sufficiency of the *Miranda* warnings is therefore not an issue.

We turn next to the questioning on July 24, when defendant asked his foster father and Phil Lerma, also a possible suspect, to accompany him to the police station. Defendant does not challenge the adequacy of the written and verbal *Miranda* warnings given on this occasion, nor does he argue that because he was under the influence of drugs he was incapable of making a knowing waiver of his rights. He contends that the statements obtained on July 24 were fruits of statements unlawfully obtained the preceding day. Since we find defendant's statements on July 23 were validly obtained there is no "taint" cast on police actions of July 24. The confession and other statements given by the defendant that day, after proper *Miranda* warnings, were admissible.

■ The remaining statements challenged are those given by the defendant to police on July 26, when he was in custody at the juvenile home. The *Miranda* warnings given him on that date were incomplete. However, this is inconsequential: the statement given by defendant on July 26 was only one version of the incident he had already told on July 24. Even if the statement should have been suppressed, its admission was harmless beyond a reasonable doubt. *Chapman v. California,* 386 US 18, 87 S Ct 824, 17 L Ed 2d 705, *rev den* 386 US 987, 87 S Ct 1283, 18 L Ed 2d 241 (1967).

■ Defendant's second assignment of error alleges that a mistrial should have been declared after the state's key witness, Steve Lerma, brother of Phil and driver of the car, testified that he had passed a polygraph test regarding his statement to police that the defendant had done all the stabbing and that Phil had done none. At trial, Steve testified that both defendant and Phil had done the stabbing, or at least that he assumed so. It was brought out at trial that at the defendant's preliminary hearing, Steve testified that Phil had done the stabbing, while at Phil's trial he had testified that he did not see it happen. Defendant cites *State v. Green,* 271 Or 153, 531 P2d 245 (1975), arguing that credibility is the exclusive province of the jury and that the jury in this case may have been improperly influenced by the testimony of the polygraph test. *Green* holds that results of a polygraph test or even the fact that a defendant was subject to a polygraph exam before making a confession are not admissible.

In *Green,* the admission was grounds for reversal. Here, however, we are not dealing with a situation in which a confession might appear to have been the product of a negative polygraph exam. This case involves a witness' testimony, upon which he himself cast doubt by telling so many different versions of his story. Courts in other jurisdictions have held that the prejudicial effect of the disclosure to a jury that a *defendant* has taken a polygraph exam can be cured where the judge fully warns the jury to disregard the evidence. *Commonwealth v. Garland,* 475 Pa 389, 380 A2d 777 (1977), *People v. Babcock,* 223 Cal App 2d 813, 36 Cal Rptr 178 (1963). We hold there was no error where the jury was thus properly instructed to disregard the evidence in the present case. The judgment is affirmed.

Affirmed.