PEOPLE v McINTOSH

Docket No. 66096. Submitted November 8, 1983, at Grand Rapids.—
    Decided May 6, 1985.

Defendant, Charles O. McIntosh, was convicted by a jury in
    Genesee Circuit Court of conspiracy to commit armed robbery,
    assault with intent to rob while armed and felony murder. The
    trial court, Harry B. McAra, J., thereafter entered an order
    sentencing defendant to serve two concurrent terms of from 35
    to 55 years imprisonment concurrently to a term of life impris-
    onment. Defendant appeals. *Held:*

1. The trial court did not abuse its discretion in permitting
    an eyewitness to the crime, Kelly Faulkner, to testify at trial
    after she had been hypnotized by the police during their
    investigation of the crimes. The witness's testimony regarding
    her identification of the defendant which occurred nine months
    after she had been hypnotized was admissible at trial since the
    identification itself was based on facts recalled and related
    prior to hypnosis. The admission of the witness's testimony did
    not deny defendant a fair trial.

2. In regard to the defendant's argument that the trial court
    erred by permitting the prosecution to use the preliminary
    examination testimony of a key witness, Beverly Alexander,
    after the witness pled the Fifth Amendment when called as a
    prosecution witness at trial, the Court of Appeals noted that
    the trial court improperly placed the burden of proving why
    the witness was unavailable on the defendant and precluded
    inquiry into why the witness was pleading the Fifth Amend-
    ment. Therefore, the Court of Appeals could not determine
    whether or not the prosecution was intentionally or negligently
    responsible for the witness's becoming unavailable. The Court
    of Appeals, therefore, remanded to the trial court for an
    evidentiary hearing at which the court is to determine why the
    witness refused to testify at trial. The court is to place the

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence § 831.7.

Admissibility of hypnotic evidence at criminal trial. 92 ALR3d 442.

[2, 3] 23 Am Jur 2d, Depositions and Discovery §§ 181-185.

[3] 29 Am Jur 2d, Evidence § 493 *et seq.*

burden on the prosecution to show that it was not intentionally or negligently responsible for the witness's refusal to testify.

3. The trial court erred in admitting into evidence under the excited utterance exception to the hearsay rule witness Kelly Faulkner's original statement to the police. The statement was insufficiently spontaneous to qualify as an excited utterance. The Court of Appeals determination as to whether or not this error was harmless will be made following the trial court's decision on remand in regard to the unavailability of witness Beverly Alexander.

Affirmed in part and remanded for proceedings consistent with the opinion. Jurisdiction is retained by the Court of Appeals.

1. CRIMINAL LAW — WITNESSES — HYPNOSIS.

Posthypnotic testimony is admissible at trial provided it is based solely on facts recalled and related by the witness prior to hypnosis and the party offering the testimony establishes its reliability by clear and convincing evidence.

2. CRIMINAL LAW — WITNESSES — EVIDENCE — HEARSAY EXCEPTIONS — UNAVAILABLE WITNESSES — BURDEN OF PROOF — CONSTITU- TIONAL LAW — RULES OF EVIDENCE.

A prosecution witness may properly be found to be unavailable to testify after pleading the Fifth Amendment and the prosecutor may then properly use the witness's preliminary examination testimony as substantive evidence in a trial; the burden is on the prosecution to establish that the witness whose prior re- corded testimony is being offered is, in fact, unavailable and that the prosecution has not, either intentionally or negli- gently, contributed to making the witness unavailable (US Const, Am V; MRE 804[a][2]).

3. WITNESSES — EVIDENCE — HEARSAY EXCEPTIONS — UNAVAILABLE WITNESSES — RULES OF EVIDENCE.

A declarant is not unavailable as a witness for purposes of implementing the exception to the hearsay rule regarding unavailable declarants if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying (MRE 804[a]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Robert E. Weiss,* Prose-

cuting Attorney, and *Donald A. Kuebler,* Chief, Appellate Division, for the people.

*Richard P. King,* for defendant on appeal.

Before: ALLEN, P.J., and R. M. MAHER and R. H. BELL,* JJ.

R. M. MAHER, J. Defendant appeals as of right from convictions of conspiracy to commit armed robbery, MCL 750.157a; MSA 28.354(1). MCL 750.529; MSA 28.797, assault with intent to rob while armed, MCL 750.89; MSA 28.284, and felony murder, MCL 750.316; MSA 28.548, following a jury trial. He was subsequently sentenced to serve two concurrent terms of from 35 to 55 years imprisonment concurrently to a term of life imprisonment.

On appeal, defendant first argues that the trial court erred by permitting an eyewitness to the crimes, Kelly Faulkner, to testify at trial after she had been hypnotized by the police during their investigation of the crimes. Prior to trial, the court held an evidentiary hearing to establish the basis of Faulkner's testimony. At the hearing, it was established that Faulkner had given a description of two men immediately after the police arrived at the scene of the crime. She had then given a second statement to another officer within hours of the crime. In these statements, she described the two men as black males between the ages of 15 and 17 years. The first man had worn a dark green stocking cap which had not covered his face, had had a short Afro haircut and had worn a dark blue raincoat. The second man had worn a green army jacket, jeans and had also had a short Afro haircut. This man had a medium to dark complexion. Neither man had facial hair. Faulkner had

---

* Circuit judge, sitting on the Court of Appeals by assignment.

then related the events leading to the shooting of her friend, Rick Blackmer.[1] During her statements to the police, Faulkner indicated that she felt "very confident" that she could identify the two men if she were to see them again.

Approximately 10 days later, Police Sergeant Leonard Accardo, a trained hypnotic investigator, conducted an interview with Faulkner. At this point in the investigation, the police did not have any suspects in the case and had turned to Accardo in the hope that Faulkner might be able to recall additional facts under hypnosis. Accardo was not aware that Faulkner had made any previous statements. He was able to hypnotize Faulkner so that she went into "a very light trance", which he described as "almost not in hypnosis". The session was tape-recorded and later transcribed. At the evidentiary hearing, the court reviewed the transcript. Under hypnosis, Faulkner described the first man as a small black man, approximately 15 or 16 years old and weighing around 125 pounds. He had worn a dark blue thin coat of medium length which Faulkner described as a "ladies coat". The coat had snaps down the front and four pockets. He also had worn a dark green knit hat with the knitting pattern going vertically down the hat. She thought he might have worn blue jeans, although she could not be sure. She described the second man as approximately 5'5" tall and slightly taller and slightly heavier than the first man. He had worn a green medium-length army jacket and blue jeans. The jacket had a patch on it that said "U S Army". The second man had a medium amount of hair which he wore "natural looking". Faulkner then again described the events at the time of the shooting. At the close

---

[1] For more facts about the crime, see *People v Centers,* 141 Mich App 364; 367 NW2d 397 (1985), in which a different panel of this Court addresses defendant's codefendant's separate appeal.

of the hypnosis session, as Accardo brought Faulkner out of the hypnotic trance, the following exchange occurred:

"*Q.* You will and every time you think about it it will become clearer and clearer to you. And what you've done is you've just refreshed your memory. You've overcome those obsticles *[sic]* that stand in your way, trauma, maybe even poor memory. I don't know if you've go *[sic]* a good memory or not.

"*A.* I don't."

Eight months after this interview, Faulkner was asked to come to the police station to view a six-person lineup. When asked if she recognized anyone in the lineup, she replied, "I'm not really sure". When asked if anyone looked familiar, she replied, "I couldn't really tell. Well, a couple looked, but I couldn't say for sure. Number one and number four I think it was." Finally, when asked if she could positively identify anyone under oath, Faulkner replied, "No, I don't think so for sure. The second person I didn't see too clear; and the one, I saw his feet only—looked smaller to me." "Number one" in the lineup was codefendant Thaddeus Centers and "number four" was defendant.

At the conclusion of this hearing, the trial court ruled that Kelly Faulkner would be permitted to testify at trial and that she could testify to her posthypnotic "identification" of defendant at the lineup. The court reached this decision based on its comparison of Faulkner's pre- and posthypnotic statements, the fact that the police did not have any suspects at the time Falkner was hypnotized and the fact that the lineup itself had not been suggestive.

After both the trial court's decision in this case

and the actual trial, the Supreme Court issued its opinion in *People v Gonzales,* 415 Mich 615; 329 NW2d 743 (1982). In *Gonzales,* the Court stated:

"The process of hypnosis is not a reliable means of accurately restoring forgotten incidents or repressed memory, and to permit posthypnotic testimony would unfairly denigrate the defendant's right to cross-examination. Therefore, we hold that until hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion, or fantasy, and until the barriers which hypnosis raises to effective cross-examination are somehow overcome, the testimony of witnesses which has been tainted by hypnosis must be excluded in criminal cases.

"We do not foreclose, by this opinion, the use of hypnosis as an extremely useful investigative tool. A party could preserve a witness's prehypnotic testimony by using an MRE 804(b)(1) deposition. After the hypnotic session, the subject would be considered 'unavailable as a witness'." 415 Mich 626-627.

The Supreme Court subsequently modified its opinion by adding the following language:

"This opinion should not be read as determining the question of the admissibility of this witness's testimony concerning facts she was able to recall and relate prior to hypnosis, a question which is reserved until raised on an adequate record in an appropriate case." 415 Mich 627.

The issue raised by the modification was recently addressed by the Supreme Court in *People v Nixon,* 421 Mich 79; 364 NW2d 593 (1984). In *Nixon,* two witnesses who had been hypnotized during the police investigation of the crime were permitted to testify at the trial. One of the witnesses testified that he had, in fact, identified the

defendant in a lineup.[2] The trial court in *Nixon* permitted their testimony after listening to tape recordings made before, during and after the hypnosis sessions, and after examining the police detective who had hypnotized the two witnesses. The trial court concluded that the police officer had not suggested any facts to the witnesses and permitted them to testify, although also permitting the defendant to play the tape recordings to the jury to assist them in evaluating the witnesses' credibility and the suggestiveness of the hypnosis procedures. On appeal to the Supreme Court, the Court not only affirmed the defendant's conviction but concluded that the trial court had not abused its discretion in admitting the testimony:

> "The trial testimony of VerHage and Porter was consistent with the facts which they had recalled and related prior to hypnosis. These prehypnotic statements were recorded, and defense counsel was given adequate notice of the statements and the circumstances surrounding the hypnosis. Furthermore, the trial court found that the procedures used by Detective Powell were not suggestive. Although additional safeguards could have been undertaken to ensure that the hypnosis did not taint the witnesses' prehypnotic recollections, we cannot say that the trial court abused its discretion in allowing the witnesses to testify." 421 Mich 90-91.

The Supreme Court reached this result after first ruling that posthypnotic testimony is admissible at trial provided it is based solely on facts recalled

---

[2] It is likely that this lineup identification occurred after the witness had been hypnotized, although it is difficult to determine this from the facts recited by either the Supreme Court or Court of Appeals (114 Mich App 233; 318 NW2d 655 [1982]). The Supreme Court opinion indicates that the lineup occurred approximately six months after the crime and suggests, but does not explicitly state, that the lineup occurred some time after the witness had described the criminal to a police artist. The sketch was made "immediately after VerHage underwent hypnosis". *People v Nixon,* 421 Mich 83.

and related by the witness prior to hypnosis and the party offering the testimony establishes its reliability by clear and convincing evidence.

On the basis of this analysis, we conclude that the trial court in this case also did not abuse its discretion, either in permitting Kelly Faulkner to testify or in permitting her to testify to the "identification" of defendant which occurred nine months after she had been hypnotized.[3] As found by the trial court, Faulkner's pre- and posthypnotic descriptions of the men were almost identical and, because the police had no suspects at the time of the hypnosis session, there was little likelihood that the police officer "suggested" a description to Faulkner. Although the danger of "confabulation" still existed,[4] the tentative nature of Faulkner's "identification" lessened this danger. Finally, as also noted by the trial court, eight months elapsed between the hypnosis and the lineup. We, therefore, conclude that the identification itself was based on facts recalled and related prior to hypnosis so that it was admissible at trial.[5] Further

[3] Faulkner later testified at trial that she remembered one fact after hypnosis which she had been unable to recall prior to hypnosis —a hand reaching over a counter. This fact was not a fact "recalled and related prior to hypnosis" and, therefore, was not admissible under *Nixon*. However, this error added nothing to the identification of defendant as one of the two men or to the description of the crime and was, therefore, harmless.

[4] See *Gonzales, supra,* 415 Mich 623-624.

[5] We recognize that the panel in *People v Centers, supra,* concluded that admission of evidence of Faulkner's identification of suspects at the posthypnotic lineup was reversible error because the actual *identification* was not something recalled and related prior to hypnosis. We are unable to agree with this conclusion because we understand *Nixon* to permit trial testimony which is based on facts recalled and related prior to hypnosis even if the statement (including identification) was obtained after hypnosis. We base this analysis on the *Nixon* Court's statement in footnote 3 that "[s]tatements obtained *after* hypnosis are inadmissible per se under *Gonzales*, except as otherwise stated in this opinion and in accordance with applicable evidentiary rules". 421 Mich 91. In this case, we find, as did the trial court, that Faulkner's tentative identification of defendant at the

support for this position may be found in *Harker v State,* 55 Md App 460; 463 A2d 288 (1983).

In addition, we note that many of the factors which contributed to the Supreme Court's conclusion in *Nixon* that the defendant in that case had had a "fair trial" are also present in this case. As in *Nixon,* the jury was "well aware of the fact that the [witness] had been hypnotized, the techniques used by the hypnotist, and the substance of the prehypnotic statements". 421 Mich 91. Kelly Faulkner was vigorously cross-examined about the effects of the hypnosis and the tentative nature of her identification of defendant at the lineup was clearly established. Finally, the defense presented an expert witness on the subject of hypnosis and, through this witness, critiqued the techniques used by the police hypnotist. We conclude that the admission of Kelly Faulkner's testimony did not deny defendant a fair trial.

Defendant also argues that the trial court erred by permitting the prosecution to use the preliminary examination testimony of a key witness, Beverly Alexander, after Alexander pled the Fifth Amendment when called as a prosecution witness at trial. At the preliminary examination, Alexander had testified that on the night of Blackmer's murder defendant had told her that he and his codefendants were going to rob a specific store. The four men had returned at approximately 3 a.m. and, at that time, defendant had told Alexander that they had robbed a different store located on Atherton (the location of the store at which this attempted robbery and shooting took place). Defendant had also told her that codefendant Thaddeus

posthypnotic lineup was based solely on facts recalled and related by her prior to hypnosis. Her in-court testimony about this identification was, therefore, solely based on facts recalled and related prior to hypnosis.

Centers had shot someone. Alexander had testified that the next day, after seeing the story on the television news, she had taken the clothing worn by defendant during the robbery and had hidden it at her mother's house. Approximately nine months later, in March, 1981, she had directed the police to the clothing.

After testifying at the preliminary examination in April, 1981, Alexander subsequently told the police (in March, 1982) that she had changed her mind and would refuse to testify at trial. Soon afterwards, Alexander was charged with conspiracy to commit armed robbery and felony murder.[6] Subsequently, when called as a witness by the prosecution at trial, Alexander pled the Fifth Amendment on her attorney's advice.[7] Over defense objections, the trial court then declared Alexander unavailable and permitted the prosecution to read her preliminary examination testimony into evidence as substantive evidence pursuant to MRE 804(a)(2). In so ruling, the court placed the burden of proving why Alexander was unavailable on defendant and refused to let the defense ask Alexander why she was pleading the Fifth Amendment because the question was "irrelevant".

On appeal, defendant argues that he was denied his right to confront Alexander by the court's ruling because Alexander may not have been "unavailable". Defendant bases this argument on the possibility that the prosecution may have been responsible for Alexander's having pled the Fifth Amendment. This case thus presents a question of

---

[6] These charges were based on Alexander's testimony at the preliminary examination that she had given defendant both the clothes he wore and the gun he used during the attempted robbery.

[7] After the trial, Alexander pled guilty to conspiracy and was sentenced to five years probation.

first impression: May a prosecutor, as the proponent of prior recorded testimony, induce the declarant to invoke her privilege against self-incrimination and still satisfy the "unavailability" requirements of both the Confrontation Clause and MRE 804?

We begin our analysis by noting that a witness may properly be found to be unavailable after pleading the Fifth Amendment and that a prosecutor may then properly use the witness's preliminary examination testimony as substantive evidence in a trial. See *People v Oaks,* 94 Mich App 745; 290 NW2d 70 (1980), and *People v Walter Moore,* 78 Mich App 294; 259 NW2d 351 (1977). However, even under MRE 804(a), "[a] declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying". Thus, under MRE 804(a), if the prosecution brought about Alexander's failure to testify by prosecuting her with the intent of preventing her testimony, Alexander was not "unavailable" and the trial court erred in admitting her preliminary examination testimony.

We further note that the Confrontation Clause appears to preclude use of prior recorded testimony in some circumstances even where the prosecutor has not intended to cause the witness not to testify. In *Motes v United States,* 178 US 458; 20 S Ct 993; 44 L Ed 1150 (1900), a codefendant testified against other defendants at a preliminary examination. Prior to trial, he escaped due to the negligence of the police. At trial, the trial court admitted the preliminary examination transcript as substantive evidence against the other defendants.

The United States Supreme Court reversed stating:

"We are unwilling to hold it to be consistent with the constitutional requirement that an accused shall be confronted with the witnesses against him, to permit the deposition or statement of an absent witness taken at an examining trial to be read at the final trial, when it does not appear that the witness was absent by the suggestion, connivance, or procurement of the accused, but does appear that his absence was due to the negligence of the prosecution." 178 US 474; 20 S Ct 999; 44 L Ed 1156.

This ruling was not premised in any way upon a finding that the prosecution had intended that the witness not appear in court.

Other cases have also focused on the prosecution's obligation to demonstrate that it has not contributed to the unavailability of the witness whose prior recorded testimony is being offered. *E.g., California v Green,* 399 US 149, 166; 90 S Ct 1930, 1939; 26 L Ed 2d 489, 501 (1970): "as long as the declarant's inability to give live testimony is in no way the fault of the State"; *People v Schepps,* 217 Mich 406, 414; 186 NW 508; 21 ALR 658 (1922): "* * * we find the important fact that the witness could not be produced to testify before the jury [to be] established without fault of the prosecution * * *"; *United States v Singleton,* 460 F2d 1148, 1153 (CA 2, 1972), *cert den* 410 US 984; 93 S Ct 1506; 36 L Ed 2d 180 (1973): "[the witness's] absence was not attributable to wilful or negligent Government action or omission * * *"; *Commonwealth v Stasko,* 471 Pa 373, 379; 370 A2d 350, 353 (1977): "the declarant's inability to give live testimony must, in no way, be the fault of the state"; *Gaskins v State,* 10 Md App 666, 679, fn 6; 272 A2d 413, 420, fn 6 (1971), *cert den* 404 US 1040; 92

S Ct 719; 30 L Ed 2d 732 (1972): "Where the unavailability of the witness is caused by the State's negligence or indifference, the former testimony may not be admitted"; *State v Dixon,* 107 Ariz 415, 418; 489 P2d 225, 228 (1971): "The prosecution must show that the inability is not chargeable to them". See also *State v Small,* 20 NC App 423, 426; 201 SE2d 584, 586 (1974); *State v Nelson,* 68 Kan 566, 573; 75 P 505, 507 (1904); 29 Am Jur 2d, Evidence, § 756, p 828. In addition, one commentator has stated:

"Nor on the other hand should the prosecutor be allowed to encourage a witness to invoke privilege by threats of criminal charges. As I have previously indicated, this factor ought not to mean that simple absence of fault on the part of the state justifies the use of unconfronted testimony, because the purpose of the Sixth Amendment was to place the risks of proof upon the state." Graham, *The Right of Confrontation and the Hearsay Rule; Sir Walter Raleigh Loses Another One,* 8 Crim L Bull 99, 139 (1972).

Finally, we are mindful of the following concerns raised by the Sixth Circuit Court of Appeals in *Stewart v Cowan,* 528 F2d 79, 84, fn 3 (CA 6, 1976):

"We agree with one commentator's view of the purposes that the Confrontation Clause should serve:

" 'The confrontation clause * * * should focus on the legitimate concerns raised by the liberalized hearsay rule: that such a rule * * * may induce prosecutorial negligence in securing witnesses by holding out the easy alternative of presenting their statements through other witnesses. Such practices undermine any system of criminal justice that presumes innocence and insists that the process of rebutting the presumption be absolutely above reproach.' Note, Confrontation and the Hearsay Rule, 75 Yale L J 1434, 1438-39 (1966)."

From the above, we conclude that the burden is on the prosecution to establish that the witness whose prior recorded testimony is being offered is, in fact, "unavailable" and that the prosecution has not, either intentionally or negligently, contributed to making the witness unavailable.

In this case, Alexander pled the Fifth Amendment on her attorney's advice after the prosecution charged her with conspiracy to commit armed robbery and felony murder. The juxtaposition of Alexander's being charged and pleading the Fifth Amendment does not necessarily show that the prosecution was intentionally or negligently responsible for Alexander's unavailability.[8] However, because the trial court improperly placed the burden of proving why Alexander was unavailable on defendant and precluded inquiry into why Alexander was pleading the Fifth Amendment,[9] we are unable to determine whether or not the prosecution was intentionally or negligently responsible for Alexander's becoming unavailable. Under

[8] For example, it is possible that Alexander would have refused to testify even if she had not been charged and even if she had faced contempt citations for her refusal to testify. In such a case, Alexander would have been unavailable and the prosecutor would have been entitled to use her prior recorded testimony. MRE 804(a)(2); *People v Pickett,* 339 Mich 294; 63 NW2d 681; 45 ALR2d 1341 (1954), *cert den* 349 US 937; 75 S Ct 781; 99 L Ed 1266 (1955); *Mason v United States,* 408 F2d 903 (CA 10, 1969), *cert den* 400 US 993; 91 S Ct 462; 27 L Ed 2d 441 (1971).

In addition, if defendant procured Alexander's refusal to testify, he cannot now complain that his confrontation rights were violated. *Reynolds v United States,* 98 US 145; 25 L Ed 244 (1878); *People v Harvey,* 220 Mich 226; 189 NW 925 (1922); *Rice v Marshall,* 709 F2d 1110 (CA 6, 1983); *United States v Mayes,* 512 F2d 637 (CA 6, 1975), *cert den* 422 US 1008; 95 S Ct 2629; 45 L Ed 2d 670 (1975).

[9] The trial court did this because it believed that the issue was whether or not the prosecution had the right to decide whether to charge Alexander or to give her immunity. We agree that the prosecutor has the discretion to decide whom to charge and on whom to confer immunity. See *People v Castaneda,* 81 Mich App 453; 265 NW2d 367 (1978). However, the issue remains why Alexander refused to testify.

these circumstances, we remand to the trial court for an evidentiary hearing at which the court is to determine why Alexander refused to testify at trial. The court is to place the burden on the prosecution to show that it was not intentionally or negligently responsible for Alexander's refusal to testify.

In so ruling, we follow the lead of the Oregon Supreme Court in *State v Herrera,* 286 Or 349; 594 P2d 823 (1979). In that case, the prosecution had entered into a conditional immunity agreement with a witness. The witness testified for the prosecution at the preliminary hearing. One business day before the defendant's trial, the prosecution filed charges against the witness. Subsequently, the witness pled the Fifth Amendment at the defendant's trial and the trial court permitted the use of his preliminary hearing testimony as prior recorded testimony. The Oregon Supreme Court agreed with the prosecution that the prosecution had the discretion to decide whom to charge and on whom to confer immunity, but remanded the case to the trial court: "[The prosecutor] must, therefore, justify the use of the evidence and show he was in no way responsible for the necessity of its use." 286 Or 358; 594 P2d 828. See also 286 Or 357, fn 6; 594 P2d 828, fn 6.[10]

The final issue on appeal concerns the admission into evidence under the excited utterance exception to the hearsay rule, MRE 803(2), of Kelly Faulkner's original "statement" to the police. We agree with the *Centers* Court that this statement was insufficiently spontaneous to qualify as an excited utterance and that the trial court erred by admitting it under the exception. *Centers, supra,* 141 Mich App 364. Our determination as to

[10] Ultimately, the defendant in *Herrera* received a new trial. *State v Herrera,* 49 Or App 1075; 621 P2d 1209 (1980).

whether or not this error was harmless will be
made following the trial court's decision on re-
mand on the preceding issue.

Affirmed in part and remanded for proceedings
consistent with this opinion. We retain jurisdic-
tion.