# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

LORENZO DONNELL RELERFORD, JR.,

Defendant-Appellant.

UNPUBLISHED
October 13, 2016

No. 327040
Genesee Circuit Court
LC No. 11-028558-FC

Before: FORT HOOD, P.J., and GLEICHER and O'BRIEN, JJ.

PER CURIAM.

Following his third trial in this matter, a jury convicted Lorenzo Relerford of felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, and unlawfully driving away an automobile (UDAA), MCL 750.413, in connection with the robbery and strangulation death of Jeanne Hank. Relerford challenges the admission of his accomplice's testimony from his first trial, the court's failure to give a duress instruction, and his counsel's examination of a single prosecution witness. These claims lack merit and we affirm.

## I. BACKGROUND

On the morning of March 10, 2011, Jeanne Hank was found lifeless in her Grand Blanc apartment, strangled to death with the cloth belt of her bathrobe. The cord for Hank's landline telephone had been ripped from the wall and her cellular telephone was missing. Her home had been ransacked and several items of jewelry and electronics were gone. Hank's Trailblazer also was not in the parking lot. Later that day, police spotted Hank's Trailblazer at a local gas station. Officers descended upon the vehicle and arrested Relerford, who was driving the vehicle, as well as his passenger, Dantoine Brown. Inside the vehicle, the officers found Hank's television, DVD player, laptop, and jewelry. Brown carried Hank's cell phone in his pocket. The officers also found a BB gun and a knife. Later investigation revealed that Relerford and Brown had travelled to local pawn shops and unsuccessfully attempted to sell the stolen items.

Relerford and Brown shifted blame onto the other for Hank's death. Relerford claimed that he had known Hank for a week and insisted that she gave him her property to sell so he could buy her drugs. To facilitate this errand, Relerford asserted, Hank loaned him her vehicle. At trial, Relerford's theory was that Brown acted alone in killing Hank, and that Relerford was merely present.

-1-

Brown later pleaded guilty to involuntary manslaughter and armed robbery in exchange for a 10-year minimum sentence and his agreement to testify against Relerford. In March 2012, a jury convicted Relerford of felony murder, armed robbery, and UDAA. This Court reversed Relerford's convictions and remanded for a new trial because Relerford was placed in shackles that were visible to the jury despite that the trial court never considered whether Relerford posed a security risk. *People v Relerford (After Remand)*, unpublished opinion per curiam of the Court of Appeals, issued November 19, 2013 (Docket No. 310488). Relerford's second trial ended with a hung jury. A jury again convicted Relerford of felony murder, armed robbery, and UDAA after his third trial. He now appeals those convictions.

## II. PRIOR TESTIMONY OF DANTOINE BROWN

At Relerford's original trial, Brown testified against him in accordance with his plea agreement. Brown asserted that Relerford picked him up on the morning of March 10, 2011, driving a Trailblazer. Relerford took Brown to Hank's apartment. Brown described Hank as friendly and corroborated Relerford's claim that Hank gave him her laptop. Things turned sour, however, and Relerford pushed Hank toward Brown and Brown volleyed her back. Brown accused Relerford of placing Hank in a chokehold and instructing Brown to rip the phone cord from the wall and to steal Hank's television and DVD player. Brown returned to the Trailblazer ahead of Relerford. Relerford came out three to five minutes later and told Brown, "Bitch is gonna quit pissing me off" and that he "had to choke her out." Brown believed this meant Relerford had killed Hank.

Brown refused to testify at Relerford's second and third trials. Brown was brought to court for questioning before Relerford's second trial and given an attorney for consultation. On the stand, Brown iterated that he would not testify, even if it resulted in vacation of his plea agreement and resentencing under harsher terms. The only reason Brown would give for his refusal was that he had already testified in this matter and the plea agreement did not require him to testify twice. The court deemed Brown unavailable to testify and someone read Brown's original testimony into the record. Ultimately, however, the jury could not agree on a verdict.

Before Relerford's third trial, the court assigned an attorney to advise Brown. When Brown was brought to the courtroom, he was uncooperative from the first. In response to the court attempting to place him under oath, Brown indicated that he would tell the truth, "But I ain't going to be no testimony." Brown conceded his awareness that his plea agreement could be revoked and he could face a longer prison term if he breached the agreement and refused to testify. Brown declined to give a reason for his decision:

> *Mr. Brown.* 'Cause I'm not.
>
> *[Prosecutor].* Do you have any basis for that?
>
> *Mr. Brown.* That is my basis, 'cause I'm not. I don't owe no explanation to nobody.

The court again deemed Brown unavailable to testify and permitted the prosecutor to have someone read the transcript of Brown's original trial testimony into the record.

Relerford challenges the admission at his third trial of Brown's testimony from the first. He does not dispute that Brown refused to testify, but argues that his former testimony did not qualify for admission under MRE 804(b)(1) because the prosecutor contributed to Brown's unavailability. Specifically, Relerford submits that the prosecutor should have actually revoked Brown's plea agreement in an attempt to force him onto the stand. The trial court rejected this argument below. We review that decision for an abuse of discretion. "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013). We review de novo any preliminary legal questions. *Id*. at 723.

"MRE 804(b)(1) excepts from the rule against hearsay a witness's prior testimony given under oath and subject to cross-examination by the opposing party if . . . the witness is unavailable to testify. . . ." *People v Lopez*, ___ Mich App ___; ___ NW2d ___ (Docket No. 327208, issued August 18, 2016), slip op at 6, citing *People v Meredith*, 459 Mich 62, 65-66; 586 NW2d 538 (1998). Here, Brown was unavailable to testify because he "persist[ed] in refusing to testify . . . despite an order of the court to do so." MRE 804(a)(2). "However, MRE 804(a) posits that '[a] declarant is not unavailable as a witness if' his or her refusal to testify 'is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying.' " *Lopez*, slip op at 6. The prosecution bore the burden of establishing Brown's unavailability under MRE 804(a), including that it did not, "either intentionally or negligently," contribute to making him unavailable as a witness. *People v McIntosh*, 142 Mich App 314, 327; 370 NW2d 337 (1985).

Relerford's challenge lacks merit. Had the prosecution revoked Brown's plea agreement, Brown likely still would have been unavailable to testify. Revocation of the plea agreement would have led to reinstatement of the criminal charges against Brown. Brown could then assert his Fifth Amendment privilege and refuse to testify, rendering him unavailable under MRE 804(a)(1).[1] Because the prosecutor could not force Brown to testify even by revoking his plea agreement, the prosecutor's failure to do so cannot be deemed a cause of Brown's absence.

Relerford additionally argues that the admission of Brown's testimony violated his constitutional right of confrontation. However, "[t]he admission of former testimony tested by cross-examination generally comports with the requirements of the Confrontation Clause." *Lopez*, slip op at 6. See *Crawford v Washington*, 541 US 36, 59; 124 S Ct 1354, 1369; 158 L Ed 2d 177, 197 (2004); *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). Brown testified at the first trial and was available for cross-examination. Relerford had the same opportunity and motive to develop Brown's testimony at his first trial as he had at his third. Accordingly, the admission of Brown's former testimony did not violate Relerford's constitutional rights.

---

[1] From Brown's comments on the record before the second and third trials, it appears that Brown may have been trying to provoke the prosecution into revoking his plea agreement. Brown's state and federal applications for leave to appeal had been denied and this may have been Brown's plan to secure a trial.

In the alternative, Relerford contends that the trial court should have informed the jury of Brown's reason (or lack thereof) for refusing to testify and allowed defense counsel to argue that Brown's refusal to testify was a factor to consider in evaluating his credibility. As noted, Brown refused to explain his reason for not testifying. He intimated that he wanted the prosecutor to revoke his plea agreement so he could test his odds at trial, but then specifically denied that his failed appeals affected his decision. Accordingly, the most the trial court could have done was to inform the jury that Brown gave no reason for deciding not to testify.

To the extent that Relerford raises an instructional challenge, we discern no error. As noted by the trial court, informing the jury that Brown refused to give a reason for not testifying would have led to speculation. That speculation could have been very prejudicial to Relerford. Individual jurors may have conjectured that Relerford did something to frighten Brown away from court. To prevent this harm, the court repeatedly instructed the jury that it must take a neutral stance as to Brown's absence, holding his absence against neither side. The court's instructions were neutral and balanced, formed an accurate comment on the situation, and were intended to prevent the jury from unfairly holding Brown's unavailability against either party.

We similarly observe no evidentiary error requiring relief. Relerford had the right to attack the credibility of Brown's prior testimony. See MRE 806. However, "evidence impeaching hearsay declarants that qualifies for admission under MRE 806 is not *automatically* admissible." *People v Blackston*, 481 Mich 451, 460; 751 NW2d 408 (2008) (emphasis in original).

> This Court expressly permits employing a balancing analysis under MRE 403 when considering the admissibility of other forms of impeachment evidence. Thus, it is within the trial court's discretion to exclude the evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." [*Id.* at 461 (citation omitted).]

Just as the trial court declined to inform the jury of Brown's lack of reason for refusing to testify, it precluded defense counsel from doing so. Although counsel may have imagined a defense built around Brown's absence, the court sagely recognized the danger to Relerford in heading down this path.

In any event, the court's instructional and evidentiary decisions did not deprive Relerford of a defense or prevent him from attacking Brown's credibility. The trial court's ruling only prevented Relerford from inviting the jury to speculate on the reason for Brown's unavailability and his unspecified refusal to testify. It did not prevent Relerford from challenging the credibility of Brown's prior testimony on other grounds. During both opening statement and closing argument, defense counsel emphasized that Brown had a strong motive to lie and shift the blame onto Relerford in order to avoid murder charges and a sentence of life imprisonment. In closing, defense counsel pointed to several instances during his testimony when Brown conceded that he had lied under oath. Counsel informed the jury that Brown "said he lied . . . about every five minutes or so during that testimony." Under the circumstances, the trial court's

narrow ruling preventing disclosure of Brown's reason for refusing to testify was not error and did not result in prejudice.

## III. DURESS INSTRUCTION

As Relerford's third trial drew to an end, defense counsel requested that the court provide an instruction on the defense of duress to the jury.[2] This instruction was supported, counsel argued, by Relerford's videotaped statement to the police, during which Relerford named Brown as the ringleader and claimed he cooperated only because Brown threatened him with a gun. The trial court declined to give the instruction because Relerford always maintained that he took no part in the robbery and UDAA, that he possessed certain of Hank's property and her vehicle with her permission, and denied any role in Hank's murder. As Relerford never admitted to breaking the law, he could not claim that he broke the law under duress.

We review de novo legal issues underlying instructional challenges and for an abuse of discretion a trial court's decision whether a jury instruction is applicable to the facts of the case. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006). The standard instruction for duress, M Crim JI 7.6, provides, in relevant part:

> (1) The defendant says that [he / she] is not guilty because someone else's threatening behavior made [him / her] act as [he / she] did. This is called the defense of duress.

> (2) The defendant is not guilty if [he / she] *committed the crime* under duress. Under the law, there was duress if [four / five] things were true:

> (a) One, the threatening behavior would have made a reasonable person fear death or serious bodily harm;

> (b) Two, the defendant actually was afraid of death or serious bodily harm;

> (c) Three, the defendant had this fear at the time [he / she] acted;

> (d) Four, *the defendant committed the act to avoid the threatened harm*. . . . [Emphasis added.]

Duress requires evidence that the defendant participated in the crime and did so to avoid threatened harm. In that circumstance, the defendant's participation is justified by the threatening behavior. Relerford relies on his police statement, in which he asserted that he feared Brown and that Brown pointed a gun at him. However, Relerford never associated

---

[2] Relerford concedes that this defense could only excuse his armed robbery and UDAA offenses, and contends that it could also have negated the armed robbery element of his felony murder charge, mitigating that offense to second-degree murder.

Brown's threatening conduct with his participation in any criminal acts. On the contrary, Relerford consistently denied that he participated in any robbery or unlawful taking of Hank's car. He claimed instead that Brown committed the robbery alone, and he affirmatively stated that Hank gave him permission to drive her Trailblazer so no UDAA occurred. And Relerford asserted that Brown did not raise any threat with the gun until they had left the scene and the crimes had already been committed. Accordingly, the trial court did not abuse its discretion in ruling that the facts did not support Relerford's requested duress instruction.

## IV. ASSISTANCE OF COUNSEL

Finally, Relerford contends that defense counsel inadequately cross examined William White, an inmate who claimed to have overheard a jailhouse conversation in which Relerford stated that he used Hank's robe belt to "lay the bitch out." Relerford emphasizes White's testimony at the first trial that he also heard Relerford state, "I put her to sleep" and "I didn't kill her." White then overheard Relerford shift the blame onto his accomplice, asserting, "He must have came back and did somethin' to her because she was still alive when I got done with her."

At Relerford's third trial, White testified that he overheard Relerford say "I had to lay the bitch out" because she would not calm down. On direct, White denied that he heard any other comments made by Relerford that day. On cross, defense counsel interrogated White about his plea agreement. He inquired into the details of White's work detail at the jail when he overheard the conversation and questioned how he could have overheard Releford's conversation. Despite that the same attorney had represented Relerford at the first and third trials, however, he asked no questions to develop the statements overheard by White. Accordingly, the jury in the third trial did not learn that Relerford told a fellow inmate that he did not kill Hank and his accomplice must have gone back to finish the job. The failure to elicit this testimony amounted to ineffective assistance, Relerford contends.

Because Relerford failed to raise this challenge in the trial court, our review is limited to errors apparent from the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). To establish ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant that he was denied the right to a fair trial. *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994). The defendant must overcome the presumption that the challenged action was sound trial strategy. *People v Tommolino*, 187 Mich App 14, 17; 466 NW2d 315 (1991). To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *People v Johnson*, 451 Mich 115, 124; 545 NW2d 637 (1996).

"Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999) (citations omitted). The defense strategy at Relerford's third trial was to show that White never overheard any conversation in which Relerford discussed his case with another inmate, and that White fabricated the account for his own personal benefit. It would have been inconsistent with this defense strategy to introduce evidence that White did indeed overhear a conversation in

which Relerford stated that he did not think he had killed Hank. Moreover, any claim by Relerford that White credibly heard Relerford say that he did not think he had killed the victim would have invited the jury to also credit White's testimony that he heard Relerford say that he had used Hank's robe belt to "lay the bitch out." Relerford has not overcome the presumption that defense counsel purposely chose not to develop the subject testimony for sound strategic reasons.

We affirm.

/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher
/s/ Colleen A. O'Brien